RUTH CALDERON–CARDONA, et al., Petitioners/Judgment Creditors,

v.

JPMORGAN CHASE BANK, N.A., Respondent/Garnishee.

Ruth Calderon–Cardona, et al., Petitioners/Judgment Creditors,

v.

The Bank of New York Mellon, Respondent/Garnishee.

Ruth Calderon–Cardona, et al., Petitioners/Judgment Creditors,

v.

HSBC, Respondent/Garnishee.

Ruth Calderon–Cardona, et al., Petitioners/Judgment Creditors,

v.

Standard Chartered, Respondent/Garnishee.

Ruth Calderon–Cardona, et al., Petitioners/Judgment Creditors,

v.

Deutsche Bank Trust Company Americas, Respondent/Garnishee.

Ruth Calderon–Cardona, et al., Petitioners/Judgment Creditors,

v.

UBS AG, Respondent/Garnishee.

Ruth Calderon–Cardona, et al., Petitioners/Judgment Creditors,

v.

Citibank, N.A., Respondent/Garnishee.

Ruth Calderon–Cardona, et al.,

Petitioners/Judgment
Creditors,

v.

Intesa Saopaolo, Respondent/Garnishee.

Ruth Calderon–Cardona, et al.,
Petitioners/Judgment
Creditors,

v.

Bank of China, Respondent/Garnishee.

No. 11 Civ. 3283 (DLC).

United States District Court,
S.D. New York.

Dec. 7, 2011.

Robert Joseph Tolchin, Robert J. Tolchin, Esq., New York, NY, for Petitioners/Judgment Creditors.

Howard B. Levi, J. Kelley Nevling, Jr., Levi Lubarsky & Feigenbaum LLP, New York, NY, for Respondent/Garnishees JP Morgan Chase Bank, N.A. and The Bank of New York Mellon.

Paul Kenneth Stecker, Phillips Lytle LLP, Tamara Anne Daniels, New York, NY, for Respondent/Garnishee HSBC.

Barry Jay Glickman, Bruce Seth Goodman, Zeichner Ellman & Krause LLP, New York, NY, for Respondent/Garnishee Standard Chartered.

Mark Putnam Gimbel, Covington & Burling LLP, New York, NY, for Respondent/Garnishee Deutsche Bank Trust Company Americas.

Samuel Bayard, Sharon L. Schneier, Davis Wright Tremaine LLP, New York, NY, for Respondent/Garnishee UBS AG.

Samuel Bayard, Sharon L. Schneier, Davis Wright Tremaine LLP, New York, NY, for Respondent/Garnishee Citibank, N.A.

Jane Marion Morril, Jennifer Gillian Newstead, Davis Polk & Wardwell L.L.P., New York, NY, for Respondent/Garnishee Intesa Saopaolo.

Lanier Saperstein, Allen & Overy, LLP, New York, NY, for Respondent/Garnishee Bank of China.

## OPINION & ORDER

DENISE COTE, District Judge.

These actions arise out of the efforts of the families and victims of a terrorist attack in Israel to satisfy a judgment entered against the Democratic Republic of North Korea (the "DPRK") and its main intelligence agency, the Cabinet General Intelligence Bureau ("CGIB") (for sake of convenience, this Opinion refers to the DPRK and the CGIB together as simply "North Korea"). The petitioners seek to satisfy the judgment by seizing accounts at the respondent banks that contain funds blocked pursuant to sanctions imposed by the U.S. Government against the DPRK. For the following reasons, the petitions are denied.

## BACKGROUND

The petitioners are the families and estates of two American citizens, Carmelo Calderon–Molina ("Calderon–Molina") and Pablo Tirado–Ayala ("Tirado–Ayala"), who were killed in a terrorist attack on Israel's Lod Airport on May 30, 1972. Tirado–Ayala and Calderon–Molina had just arrived at Lod Airport and were collecting their luggage when terrorists affiliated with the Japanese Red Army and the Popular Front for the Liberation of Palestine opened fire, killing Calderon–Molina and wounding Tirado–Ayala.

Their families and estates brought suit against the DPRK and the CGIB on March 27, 2008, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602–11, in the United States District Court for the District of Puerto Rico. The families alleged that the DPRK and the CGIB provided material support to the terrorists by supplying them with the armaments used to carry out the attack. On July 16, 2010, the district court entered judgment (the "Judgment") for the families in the amount of $378 million. *See Calderon–Cardona v. Democratic People's Republic of Korea*, 723 F.Supp.2d 441, 460–85 (D.P.R.2010). The Judgment remains entirely unsatisfied.

On October 28, 2010, the Judgment was registered in the Southern District of New York pursuant to 28 U.S.C. § 1963. The petitioners then served a subpoena on the United States Treasury Department's Office of Foreign Assets Control ("OFAC"), seeking the identities of all financial institutions that held the proceeds of electronic fund transfers ("EFTs") that were blocked pursuant to sanctions against the DPRK, called the North Korean Sanctions Regulations ("NKSRs").[1] The OFAC produced a

---

1. The Second Circuit offered a helpful explanation of the nature and operation of EFTs in *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.,* 585 F.3d 58 (2d Cir.2009):

An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank that bank simply debits the originator's ac-

list of financial institutions in response to the subpoena; on February 18, 2011, the petitioners filed petitions in the Southern District requesting an order directing the respondent banks to turn over the proceeds of these blocked EFTs ("the blocked EFTs") pursuant to § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297; § 1610(g) of FSIA; and N.Y. C.P.L.R. §§ 5225(b) and 5227.

On February 24, the Honorable Richard Berman, acting as Part I Judge, issued an Order to Show Cause. The Order to Show Cause was served on the respondents on March 2. On May 12, respondent Intesa Saopaolo entered into a stipulation with petitioners to resolve the action against it and to relieve it of the obligation of appearing in this matter. Also on May 12, the Honorable Richard Holwell issued an order consolidating the related actions; on May 24, the cases were assigned to this Court. On various dates from May through July, the respondents filed answers to the petition.

During a conference on July 7, the Court determined that it would rule on the threshold question of whether the Order to Show Cause establishes, as a matter of law, that the blocked EFTs can be subject to attachment. It was also determined that the Court would postpone addressing the issue of providing notice to third parties that might have an interest in the blocked EFTs. The respondents were invited to submit new or revised briefs in support of their previously-filed oppositions to the Order to Show Cause. They were also invited to join in each other's briefs to avoid duplicative filings. On August 11, respondent JPMorgan Chase Bank, N.A. filed an additional memorandum of law in support of its opposition to the Order to Show Cause. The other respondents joined in this submission. The petitioners filed a reply on September 23. Respondents JPMorgan Chase Bank, N.A. and Deutsche Bank Trust Company Americas filed briefs in further support of their opposition to the Order to Show Cause on October 7, and were joined by the other respondents.

## DISCUSSION

Under Federal Rule of Civil Procedure 69, New York law provides the procedural rules to be followed in this matter. N.Y. C.P.L.R. §§ 5225(b) and 5227 allow for a judgment creditor to file a petition for turnover of property in the hands of a third-party who either "possesses money or property in which the judgment debtor has an interest," N.Y. C.P.L.R. § 5225(b), or "is or will become indebted to the judgment debtor." N.Y. C.P.L.R. § 5227.

Pursuant to Rule 69, federal law governs these proceedings "to the extent it ap-

---

count and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium. If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account. If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank. To use an intermediary bank to com-

plete the transfer, the banks must each have an account at the intermediary bank (or at different banks in the same consortium). After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account. The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients. *Id.* at 60 n. 1.

plies." Fed.R.Civ.P. 69(1). The petitioners argue that the blocked EFTs are attachable under § 201 of TRIA and § 1610(g) of FSIA. Because the blocked EFTs do not constitute property subject to attachment under either statute, however, the petitions must be dismissed.

## I. Attachable Property Under § 201 of TRIA

The role of a court is "to interpret the language of the statute enacted by Congress." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). Statutory interpretation must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252, 124 S.Ct. 1756, 158 L.Ed.2d 529 (2004) (citation omitted).

> Section 201 of TRIA provides as follows: Notwithstanding any other provision of law, ... in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a), 116 Stat. 2337.

Pursuant to the plain language of this section of TRIA, property is attachable only in those cases in which (1) "a judg-

ment has been obtained," (2) this judgment is "against a terrorist party," (3) the judgment is "on a claim based upon an act of terrorism" or "for which a terrorist party is not immune" under FSIA § 1605(a)(7),[2] (4) the property in question consists of "blocked assets," and (5) these blocked assets are "of that terrorist party." This final requirement does not exclude assets that are "of any agency or instrumentality of that terrorist party."

### A. The meaning of "terrorist party"

■ The petitioners cannot meet these statutory requirements because the blocked assets in question are not "of that terrorist party." TRIA § 201(d) defines the term "terrorist party" as

> a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C.App. 2405(j)) or Section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

TRIA § 201(d)(4). Under this definition, North Korea plainly does not qualify as a "terrorist" because it is not a natural person. Nor is North Korea a "terrorist organization." Section 212(a)(3)(b)(vi) of the Immigration and Nationality Act ("INA") is aimed at non-governmental groups like al Qaeda and Hezbollah, not foreign states. And North Korea is not currently designated as a state sponsor of terrorism under either § 6(j) of the Export Administration Act of 1979 (the "EAA") or § 620A of the Foreign Assistance Act of 1961. In 1998, North Korea was designated as a state sponsor of terrorism under § 6(j) of

**2.** As discussed below, FSIA § 1605(a)(7) was the original state sponsor of terrorism excep-

tion to FSIA, and was repealed in 2008.

the EAA, *see* Notice, Determination Pursuant to § 6(j) of the Export Administration Act of 1979; North Korea, 53 Fed. Reg. 3477 (Feb. 5, 1988), but this designation was rescinded on October 11, 2008. *Id. See* Notice, Rescission of Determination Regarding North Korea, 73 Fed.Reg. 63540 (Oct. 24, 2008); U.S. Dep't of State, *State Sponsors of Terrorism*, http://www.state.gov/s/ct/c14151.htm. With this rescission, North Korea's status as a "terrorist party" under TRIA § 201 came to an end.

The petitioners argue that North Korea qualifies as a "foreign state designated as a state sponsor of terrorism" because petitioners were permitted to bring their initial FSIA action in 2008 precisely because of North Korea's then designation as a state sponsor of terrorism under § 6(j) of the EAA.[3] This argument ignores the plain language of TRIA.

The Supreme Court has noted that although it "does not review congressional enactments as a panel of grammarians," neither does it "regard ordinary principles of English prose as irrelevant to a construction of those enactments." *Flora v. United States*, 362 U.S. 145, 150, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). Moreover, "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992).

The passage of TRIA § 201 that defines the term "terrorist party" is written in the passive voice, without the use of a verb tense. *See* TRIA § 201(d). There is no other indication in this definition as to precisely *when* a state must be designated as a state sponsor of terrorism in order for it to qualify as a "terrorist party." It is therefore necessary to look to the language of TRIA § 201(a) that precedes and follows use of the term "terrorist party" for insights into Congress's meaning.

The first reference to the term "terrorist party" in TRIA § 201(a) provides some initial support to petitioners' claims. This portion of the statute is written in the present perfect tense. *See* TRIA § 201(a) ("in every case in which a person *has obtained* a judgment against a terrorist party ...") (emphasis supplied). "The present perfect tense refers to (1) a time in the indefinite past, or (2) a past action that comes up to and touches the present." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir.2010) (citation omitted). Because North Korea qualified as a terrorist party at the time of the underlying judgment— i.e., it was designated as a state sponsor of terrorism at that time—the petitioners "ha[ve] obtained a judgment against a terrorist party." The petitioners therefore fulfill the first two requirements of TRIA § 201(a) discussed above.

■ The second time the term "terrorist party" is referenced, however, the statute is written in the present tense. *See* TRIA § 201(a) ("the blocked assets of that terrorist party ... *shall* be subject to execution or attachment") (emphasis supplied). The language of this passage pre-

---

**3.** In their initial action, petitioners first invoked jurisdiction under FSIA § 1605(a)(7), but then re-filed their claim on March 27, 2008, invoking jurisdiction under FSIA § 1605A, because § 1605(a)(7) had been repealed on January 28, 2008. FSIA § 1605A directs courts to hear FSIA claims when "the foreign state was designated as a state sponsor of terrorism when ... the related action under section 1605(a)(7) ... was filed," amongst other reasons. North Korea was des-

ignated as a state sponsor of terrorism when petitioners filed their original action under § 1605(a)(7). *See Calderon–Cardona v. Democratic People's Republic of Korea*, 723 F.Supp.2d 441, 459 (D.P.R.2010). Petitioners seek to enforce judgment under TRIA § 201, however, not FSIA § 1605A; in contrast to FSIA § 1605A, TRIA § 201(d) does not include explicit language referring to the time when the original action was filed.

sumes that the "terrorist party" against which a petitioner "has obtained a judgment" is *still* a "terrorist party" at the time its blocked assets "shall" be subject to attachment. In Congressional statutes, "the present tense generally does *not* include the past." *Carr v. United States,* —— U.S. ——, ——, 130 S.Ct. 2229, 2236, 176 L.Ed.2d 1152 (2010) (emphasis supplied); *see also* The Dictionary Act, 1 U.S.C. § 1 (2000) ("In determining the meaning of any Act of Congress, unless the context indicates otherwise ... words used in the present tense include the future as well as the present."); Raymond W. Pence & Donald W. Emery, A Grammar of Present Day English 262 (2d ed. 1963) (The present tense "in general represents present time."). Moreover, the Supreme Court has determined that this passage of TRIA § 201 speaks as of the date when a court rules on an application for turnover, not the date when a judgment creditor's claim arises. *See Ministry of Defense v. Elahi,* 556 U.S. 366, 129 S.Ct. 1732, 1739, 173 L.Ed.2d 511 (2009) (asset not attachable because it "was not 'blocked' at the time of the decision [in the enforcement proceeding] below"). For these reasons, the most natural reading of TRIA § 201(a) is that it requires a judgment debtor to be a "terrorist party" both at the time of the underlying judgment and at the time of the enforcement proceeding.

This interpretation also makes intuitive sense. Prior to any enforcement proceeding, the parties engage in private litigation. The government intervenes directly in these private proceedings through TRIA only at the moment of enforcement, when a party seeks special access to the "the blocked assets of [a] terrorist party" to satisfy a judgment. The impact of TRIA

thus occurs at the moment of enforcement, not the moment of judgment in the underlying action or the bringing of an initial claim. *See In re Ames Dept. Stores, Inc.,* 582 F.3d 422, 427 (2d Cir.2009) (The plain language of the statute is considered in the context in which it is used and the "broader context of the statute as a whole.").

■ A court may "turn to the legislative history only when the plain statutory language is ambiguous or would lead to an absurd result." *Id.* (citation omitted). Where, as here, a statute's language is unambiguous, "the sole function of the courts is to enforce it according to its terms." *Katzman v. Essex Waterfront Owners LLC,* 660 F.3d 565, 568 (2d Cir. 2011) (citation omitted). In other words, "[w]hen a court determines that the language of a statute is unambiguous, its inquiry is complete." *United States v. Santos,* 541 F.3d 63, 67 (2d Cir.2008).

■ Even if the language of TRIA § 201(a) were ambiguous, however, it should still be construed so as to deny petitioners' claims. Courts are to construe the meaning of ambiguous statutes "to contain that permissible meaning which fits most logically and comfortably into the body of both previously and subsequently enacted law." *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, 100, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). TRIA was enacted in 2002 and codified as a note to FSIA § 1610.[4] Certain provisions in FSIA enacted both prior to and subsequent to TRIA demonstrate that when Congress intended to allow claims to go forward due to a state's designation as a sponsor of terrorism at a particular moment in the past, it employed clear statutory language to this effect. The original

---

4. This section of FSIA addresses exceptions to sovereign immunity from attachment or execution.

state sponsor of terrorism exception to FSIA, enacted in 1996 as part of the Antiterrorism and Effective Death Penalty Act, abrogates sovereign immunity if a state was designated as a sponsor of terrorism "*at the time the [terrorist] act occurred,*" subject to certain exceptions. 28 U.S.C. § 1605(a)(7) (emphasis supplied). Amendments to FSIA's terrorism exceptions, enacted in 2008, include similarly specific, clear language in reference a state's designation as a state sponsor of terrorism. 28 U.S.C. § 1605A mandates as follows:

> The Court shall hear a claim under this section if the foreign state was designated as a state sponsor of terrorism *at the time the [terrorist] act . . . occurred,* or was so designated *as a result of such act,* and . . . either *remains so designated when the claim is filed* under this section or *was so designated within the 6–month period before the claim is filed* under this section.

28 U.S.C. § 1605A(a)(2) (emphasis supplied). This kind of careful statutory language in FSIA belies the notion that Congress, when referencing the designation of state sponsors of terrorism, could have intended to refer to a specific moment in the past and yet left that intention unexpressed.

In addition, the designation of a country as a state sponsor of terrorism or the rescission of such a designation is a politically-sensitive decision reserved to the Executive Branch. A number of consequences result from a country's designation as a state sponsor of terrorism, such as restrictions on U.S. foreign assistance, a ban on defense exports and sales, controls over exports of dual use items, and financial restrictions. *See* U.S. Dep't of State, *State Sponsors of Terrorism,* http://www.state.gov/s/ct/c14151.htm. By referencing such designations, TRIA § 201(d) provides the Executive with an additional tool to encourage states to stop sponsoring terrorist activity. A ruling that certain consequences of designation cannot be undone at a later date would unduly restrict the Executive Branch's ability to employ this tool to full effect.

A close investigation into the legislative history of TRIA provides no support for alternative interpretations of the statute. For example, this legislative history indicates that Congress intended the statute to aid victims in recovering judgments against terrorist parties. According to Senator Tom Harkin, one of TRIA's sponsors, speaking on the floor of the Senate prior to passage of the act, the purpose of TRIA § 201 was:

> to deal comprehensively with the problem of enforcement of judgments issued to victims of terrorism in any U.S. court by enabling them to satisfy such judgments from the frozen assets *of terrorist parties. . . .* [TRIA § 201] establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S., and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin) (emphasis supplied). Although indicative of TRIA's broadly remedial purpose, this statement begs the question of what, precisely, constitutes a "terrorist party."

The legislative history also shows that Congress intended the law to serve as a deterrent to current state sponsors of terrorism. Senator Harkin explained the impact of the legislation as follows:

> This tougher U.S. policy will provide a new, powerful disincentive for any foreign government to continue sponsoring terrorist attacks on Americans, while also discouraging any regimes tempted

to get into the ugly business of sponsoring future terrorist attacks.

148 Cong. Rec. S11527 (daily ed. Nov. 19, 2002) (statement of Sen. Harkin). TRIA's efficacy as a "powerful disincentive" for a foreign government to continue sponsoring terrorist attacks would be diminished if the blocked assets of such a government would still be subject to attachment even after the rescission of its designation as a state sponsor of terrorism.

Notwithstanding the plain language of TRIA, its fit within previously and subsequently enacted law, and its legislative history, the petitioners argue that the "context" of TRIA § 201 demands that the statute's use of the present tense be construed to include the past. The petitioners point out that TRIA defines "terrorist party" as including "a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. § 1182(a)(3)(B)(vi)))." Under that provision, a "terrorist organization" includes "any group of two or more individuals, whether organized or not, which *engages in*, or has a subgroup which *engages in*, [specified terrorist] activities." 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (emphasis supplied). To interpret this provision as encompassing only those groups that are engaging in terrorist activities at the precise moment of an enforcement proceeding would, petitioners argue, exclude virtually all such groups—an anomalous outcome at odds with Congress's purpose in enacting TRIA to provide "compensation for ... losses resulting from acts of terrorism." TRIA § 101(b). Because Congress would not have intended to prevent victims of terrorism from collecting on judgments during those periods when a terrorist group is not planning or initiating an attack, the context demands that both this definition and TRIA's definition of "terrorist state" be construed to include the past.

Contrary to petitioners' assertions, the "context" of TRIA § 201(d) demands no such construction. In arguing that TRIA's definition of "terrorist organization" indicates that the present tense should be construed to include the past, the petitioners ignore the remainder of the definition of "terrorist organization." In addition to the passage quoted above, a "terrorist organization" under TRIA includes any group designated as a foreign terrorist organization by the Secretary of State under INA § 1189 or otherwise, as well as any group that engages in, *inter alia*, "prepar[ing] and plan[ning] terrorist activity," "gather[ing] information on potential targets for terrorist activity," and "solicit[ing] funds" for a terrorist activity of organization. 8 U.S.C §§ 1182(a)(3)(B)(iv), 1182(a)(3)(B)(vi). Arguably, the breadth of this definition obviates any need to construe use of the present tense to include the past.

Regardless of the correct approach to interpreting TRIA's use of the term "terrorist organization," however, petitioners do not explain why this approach should extend to "foreign state[s] designated as ... state sponsor[s] of terrorism." Common sense dictates that the differences between these two types of terrorist parties reflect manifestly different contexts. Whereas TRIA's definition for "terrorist organizations" encompasses a wide variety of groups engaged in a wide variety of activities, the designation or rescission of a designation of a foreign state as a state sponsor of terrorism is a rare event. Currently, there are only four states designated as state sponsors of terrorism under the relevant authorities. And since 1979, when the Executive Branch began designating states as state sponsors of terrorism, only four states have had their designation rescinded.[5] Although a literal

---

**5.** Iraq, Libya, North Korea, and South Yemen.

reading of the definition of "terrorist organization" might, arguably, lead to an unpredictable and anomalous state of affairs—in which blocked assets are attachable one day, cease being attachable the next, become attachable once again, then cease again, and so on—there is little danger that the same would occur with respect to states designated as state sponsors of terrorism.

The petitioners further argue that North Korea is a "terrorist party" pursuant to TRIA § 201 because it fits within TRIA's definition of "terrorist organization." As discussed above, TRIA defines "terrorist organization" by referencing § 212(a)(3)(B)(vi) of the INA. 8 U.S.C. § 1182(a)(3)(B)(vi). The definition includes any organization designated as a terrorist organization by the Secretary of State under INA § 1189 or otherwise, or "any group of two or more individuals, whether organized or not, which engages in, or has a subgroup which engages in, [specified terrorist] activities." North Korea is a group of two or more individuals that might very well engage in one or more of the terrorist activities specified in the relevant sections of the INA. Plainly, however, this definition was intended to encompass organizations other than foreign states. The definition is used under the INA for such purposes as to prevent U.S. citizens from contributing to such organizations, 8 U.S.C. § 1189(a)(1)(B), and to bar members of such organizations from obtaining visas, 8 U.S.C. § 1182(a). Among those groups designated as a terrorist organization by the Secretary of State pursuant to INA § 1189 or other-

wise, not one is a sovereign state. *See, e.g.,* Individuals and Entities Designated by the State Department Under E.O. 13224 (June 16, 2011), http://www.state.gov/s/ct/rls/other/des/143210.htm; U.S. Dep't of State, Foreign Terrorist Organizations (May 19, 2011), http://www.state.gov/s/ct/rls/other/des/123085.htm). Moreover, if Congress intended the term "terrorist organization" to encompass terrorist states, it would not have included a separate section of the definition of "terrorist party" that applies specifically to foreign states. *See, e.g., Corley v. United States,* 556 U.S. 303, 129 S.Ct. 1558, 1566, 173 L.Ed.2d 443 (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (citation omitted)); *Yiu Sing Chun v. Sava,* 708 F.2d 869, 874 (2d Cir.1983) ("[O]ur duty is to give harmonious operation and effect to all statutory provisions if possible.").

B. The meaning of "blocked assets of that terrorist party"

Even if North Korea qualifies as a "terrorist party," petitioners still cannot attach the blocked EFTs because these accounts do not consist of "blocked assets of [North Korea]." The plain language of TRIA § 201 requires *both* that the accounts be "blocked assets" and that these blocked assets be "of that terrorist party." The petitioners cannot establish the latter requirement.[6]

The Supreme Court has determined that "the use of the word 'of' denotes owner-

---

**6.** TRIA defines "blocked assets" as "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)," subject to certain exceptions. The frozen assets in the accounts at respondent banks con-

sist of EFTs blocked under §§ 202 and 203 of the International Emergency Economic Powers Act, which provides the Executive with authority to issue sanctions "if the President declares a national emergency with respect to" a particular threat. 50 U.S.C. 1701. These accounts thus qualify as "blocked assets" under TRIA § 201.

ship." *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.,* —— U.S. ——, ——, 131 S.Ct. 2188, 2196, 180 L.Ed.2d 1 (2011) (citation omitted). For the accounts at respondent banks to be attachable, then, North Korea or one of its agencies or instrumentalities must actually *own* it.

■ Under New York law, which applies here, neither North Korea nor any of its agencies or instrumentalities owns the blocked EFTs. Unless there is a federal statute or regulation that governs, courts generally apply state law when determining interests in or ownership of property. *See Export–Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd. ("Asia Pulp"),* 609 F.3d 111, 117 (2d Cir.2010) ("In the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have." (citation omitted)). In cases where, as here, a statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law," the Second Circuit has delineated a two step method of analysis.

> First, we look initially to state law to determine what rights the judgment debtor has in the property the [petitioner] seeks to reach. Second, we then look to federal law to determine whether the judgment debtor's state-delineated rights constitute a[n] ... interest in property sufficient to trigger application of the [relevant statute].

*Id.* (citation omitted).

Nowhere in TRIA is there a definition of "property" or "property ownership," or any other indication that the statute intends to create a special regime of federal property interests or rights. Accordingly, it is necessary to follow the Second Circuit's two step approach and "look to state law to determine whether EFT's can be considered a 'defendant's' property for purposes of attachment ...." *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd. ("Jaldhi"),* 585 F.3d 58, 70 (2d Cir. 2009).

■ Article 4–A of New York's Uniform Commercial Code ("U.C.C.") delineates the extent of parties' property interests in blocked EFTs. *See* U.C.C. § 4–A–502(4); *Asia Pulp,* 609 F.3d at 119 n. 7. The Second Circuit has ruled repeatedly and unambiguously that, pursuant to Article 4–A, the interest of an originator or a beneficiary in a midstream EFT falls short of property ownership. *See Jaldhi,* 585 F.3d at 71 ("EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank."); *accord Scanscot Shipping Services GmbH v. Metales Tracomex LTDA,* 617 F.3d 679, 682 (2d Cir.2010); *Asia Pulp,* 609 F.3d at 115–16. Even under statutory provisions broader than those in TRIA § 201(a), the interest of an originator or beneficiary in a midstream EFT has been ruled insufficient to allow for attachment. For example, the Federal Debt Collection Procedures Act requires only that a debtor have a "substantial ... interest" in the property sought to be attached, and yet the "interest or right an originator or intended beneficiary ... in a midstream EFT under New York law" is insufficient to meet even this minimal standard. *Asia Pulp,* 609 F.3d at 121. Similarly, Rule B(1)(a) of the Admiralty Rules allows attachment of "the defendant's tangible or intangible personal property." Fed.R.Civ.P. Supp. R. B(1)(a). Although the Second Circuit determined that "[i]t is difficult to imagine ... more broadly inclusive" words than these, it did not allow for attachment of midstream EFTs of which the defendants were the intended beneficiaries. *Jaldhi,* 585 F.3d at 66, 67–68. By contrast, TRIA § 201(a) allows for attachment only of property that is "of that

terrorist party." Because neither North Korea nor any of its agencies or instrumentalities owns the blocked EFTs, this property is not subject to attachment pursuant to TRIA.

Petitioners argue that the blocked EFTs are attachable pursuant to TRIA § 201 because they fit within TRIA's expansive definition of "blocked assets," and because TRIA is a remedial statute intended by Congress to pre-empt any contrary state or federal laws. TRIA does not pre-empt New York law, however, because it provides no guidance for determining which blocked assets are "of that terrorist party."

■ Pre-emption may be express or implied. "Express preemption arises when a federal statute expressly directs that state law be ousted." *Island Park, LLC v. CSX Transportation*, 559 F.3d 96, 101 (2d Cir. 2009) (citation omitted). "In the absence of an express directive from Congress, pre-emption may be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* (citation omitted). Pre-emption may be inferred because

> the scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose.

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (citation omitted).

■ In support of their pre-emption argument, the petitioners cite two cases

from this District—*Hausler v. JP Morgan Chase Bank*, 740 F.Supp.2d 525 (S.D.N.Y. 2010) and *Levin v. Bank of New York*, 09 Civ. 5900(RPP), 2011 WL 812032 (S.D.N.Y. Mar. 04, 2011)—in which courts held that TRIA § 201 pre-empted state property law. In *Hausler*, the district court addressed whether assets blocked by OFAC pursuant to sanctions against Cuba, the Cuban Asset Control Regulations ("CACRs"), were subject to attachment pursuant to TRIA. The *Hausler* court placed a particular emphasis on two aspects of TRIA that it believed supported preemption. First, the court noted that TRIA § 201(a) begins with the phrase "[n]otwithstanding any other provision of law" (the "Notwithstanding Clause") and that such provisions have been interpreted "to supersede all other laws and to indicate preemption." *Hausler*, 740 F.Supp.2d at 531 (citation omitted).

Second, the court pointed out that TRIA § 201(a) uses the term "blocked assets," and specifically defines this term. Pursuant to TRIA § 201(d), a blocked asset consists of "any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C.App. § 5(b)) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1702)." The CACRs had been issued by OFAC under § 5(b) of the Trading With the Enemy Act ("TWEA"). The court thus found that "Congress explicitly directed that TRIA and the CACRs are to be considered in tandem." *Hausler*, 740 F.Supp.2d at 532. The CACRs, in turn, provided expansive definitions for terms like "property" and "property interest" that, the court argued, were "plainly intended to broadly demarcate the scope of and establish Cuba's interests in specified assets, not to attach consequences to property interests defined elsewhere." *Id.* The petitioners point out, rightly, that the

CACRs are functionally identical to the NKSRs.

The court in *Levin* adopted many of the arguments in *Hausler* but also found, in *dicta*, that blocked EFTs are subject to attachment under FSIA § 1610(f)(1)(A), and that this provision "provides further indications that Congress intended for all blocked assets in which terrorist entities have an interest to be available for attachment by plaintiffs holding valid judgments." *Levin*, 2011 WL 812032, at *18. Like TRIA, FSIA § 1610(f)(1)(A) includes a "notwithstanding clause" and references TWEA.[7]

Petitioners further argue that TRIA § 201 pre-empts state law because utilizing the U.C.C. property rules would bar enforcement of a federal right and interfere with important federal policy, and that this principle applies to state laws creating special property regimes. The petitioners cite to two cases from the 1950s in which federal courts struck down state community property laws for undermining the purpose or intent of federal statutes. *See Wissner v. Wissner*, 338 U.S. 655, 661, 70 S.Ct. 398, 94 L.Ed. 424 (1950); *Walet v. Jefferson Lake Sulphur Co.*, 202 F.2d 433, 434 (5th Cir.1953).

Although courts have on occasion found certain federal statutes to pre-empt state property laws, the petitioners' pre-emption argument contradicts the plain meaning of TRIA § 201. Petitioners are correct, however, that the NKSRs are striking in their breadth and scope. The NKSRs prohibit the following transactions:

> [a]ll transfers of credit and all payments between, by, through, or to any banking institution or to any banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States
> . . . .

31 C.F.R. § 500.201. Such transactions are prohibited if and when they are made

> by, or on behalf of, or pursuant to the direction of any designated foreign country, or any national thereof, or [if] such transactions involve property in which any designated foreign country, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect.

*Id.*[8] The regulations provide broad definitions for such terms as "foreign country,"

---

7. FSIA § 1610(f)(1)(A) reads as follows:

Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. § 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C.App. § 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. § 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701–1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such

property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A. 28 U.S.C. § 1610(f)(1)(A). The petitioners cannot rely on this section directly, however, because it is subject to Presidential waiver and President Clinton exercised this waiver authority upon signing the bill into law. *See* 28 U.S.C. § 1610(f)(3); *In re Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31, 56 (D.D.C.2009).

8. Section 500.205 requires that funds blocked pursuant to § 500.201 be held in interest-bearing accounts in a domestic bank. 31 C.F.R. § 500.205. Hence the presence of these accounts at respondent banks. North Korea first became a "designated foreign country" for purposes of these regulations on December 17, 1950. The provision for block-

"national," "transfer," "property," and "property interests." *Id.* at §§ 500.301–500.322. These sanctions do not reach only property owned directly by North Korea or one of its agencies or intrumentalities. Rather, they reach as far as property in which a North Korean *"national"* has "any interest of any nature whatsoever, direct or indirect." *Id.* at § 500.201.

Assuming, *arguendo,* that TRIA incorporates the NKSRs' definitions of "property" and "property interests," and that by "blocked assets of that terrorist party" Congress meant to say in effect "blocked assets in which that terrorist party has a property interest," enforcement of this provision would lead to absurd results. Under such a reading, the phrase "blocked assets of that terrorist party" would include all property in which *any* North Korean "national" has "any interest of any nature whatsoever, direct or indirect." It would thus allow attachment of assets with only the most tangential relationship to North Korea. For example, if a North Korean national living and working in a third country attempted to send money to his personal bank account in North Korea, this transfer could be blocked pursuant to the NKSRs and, under petitioners' reading of TRIA, be subject to attachment. *Cf.* Supporting Declaration to Statement of the United States of America, *Rux v. ABN Amro Bank, N.V.,* 08 Civ. 6588(AKH), p. 7.

Fortunately, however, TRIA § 201(a) does not include such language or definitions, so no choice between this result and the statute's plain language needs to be made. TRIA permits attachment not of "blocked assets in which that terrorist party has any property interest," or "all assets blocked pursuant to OFAC sanctions regulations targeting that terrorist party." Rather, it allows for attachment only of "blocked assets *of that terrorist party.*" TRIA § 201(a) (emphasis supplied).

Moreover, while the NKSRs offer definitions for terms like "property" and "property interest," they do not offer a definition for property *ownership.* Nor do they imply that simply because a certain piece of "property" or "property interest" is blocked pursuant to the sanctions regime, it therefore belongs to the designated foreign country in question. Interests in property are "not necessarily synonymous with 'title to' or 'ownership' of property." *Asia Pulp,* 609 F.3d at 120. It is reasonable for courts to hold "that an individual has an interest in property, even when he does not own that property, so long as the property benefitted him as if he received the property directly." *Id.*

Overall, the OFAC regulations provide a comprehensive delineation of "transactions" that are "prohibited" and thus subject to blocking by OFAC; they do not establish a terrorist party's substantive property rights to specified assets. *See* 31 C.F.R. §§ 500.201–500.332. In short, nowhere in the OFAC regulations is there any guidance whatsoever for determining which subset of "blocked assets" constitutes those that are "of that terrorist party" and that should therefore be subject to attachment. There is thus ample room for state law to supplement this federal regime, even if one fully incorporates the OFAC regulations (and definitions) into TRIA.

 This reading of the NKSRs coincides with OFAC's own interpretation of similar regulations. In another case in which petitioners sought to attach blocked assets pursuant to TRIA § 201, the United States submitted a Statement of Interest based on the supporting declaration of the Associate Director of OFAC's Office of Program Policy and Implementation. According to the United States,

___

ing wire transfers to the DPRK remained in effect until June 26, 2008.

[T]he mere fact that assets have been blocked pursuant to the [sanctions regime] ... does not show that the assets at issue are *owned* by the [defendant government]. Rather, ... the fact that the assets are blocked establishes only that the [defendant government] has some blockable "property interest"—as the term is broadly defined by OFAC for purposes of the [sanctions] regime— in the assets.... Any determination of whether particular assets are not immune from execution under TRIA will require the Court to determine whether the [defendant government] has a sufficient ownership interest in the assets such that the assets are—in TRIA's language—assets "of that terrorist party."

Statement of the United States of America, *Rux v. ABN Amro Bank, N.V.*, 08 Civ. 6588(AKH). An agency's reasonable interpretation of its own regulations, even if it comes in the form of a legal brief, should be accepted unless it is "plainly erroneous or inconsistent with the regulation." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 397, 128 S.Ct. 1147, 170 L.Ed.2d 10 (2008) (citation omitted). OFAC's interpretation of its sanctions regulations is reasonable and thus entitled to deference.

■■■ The petitioners rely heavily on the decision in *Hausler*, in which the court reasoned that the respondents' statutory interpretation relies entirely on the word 'of' in the phrase "blocked assets of that terrorist party" as equating to title or actual ownership of property. *Hausler*, 740 F.Supp.2d at 533–34. Even if the respondents' argument hinged on that single word, that is of no import. In *Jaldhi*, the Second Circuit interpreted a mere apostrophe in Rule B(1)(a) of the Admiralty Rules to connote ownership. *See Jaldhi*, 585 F.3d at 66–67 (under statute that allows attachment of "the defendant's

tangible or intangible personal property," only property that is "the 'defendant's'" is attachable). A court must "give effect, if possible, to every clause and word of a statute," *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 139 (2d Cir.2003) (citation omitted), and the Supreme Court has instructed that "the use of the word 'of' denotes ownership.'" *Leland Stanford Junior University*, 131 S.Ct. at 2196. The petitioners' construction of TRIA, by contrast, effectively reads the phrase "of that terrorist party" out of the statute.

The *Hausler* court further argued that the Supreme Court's analysis of TRIA in *Ministry of Defense v. Elahi*, 556 U.S. 366, 129 S.Ct. 1732, 173 L.Ed.2d 511, supports a construction of the phrase "blocked assets of that terrorist party" that includes both owned property and intangible interests in property, as put forward in the applicable OFAC sanctions regulations. *Hausler*, 740 F.Supp.2d at 534. But the passages in *Elahi* cited by the *Hausler* court address only whether the property at issue constituted a "blocked asset" under TRIA, not whether these assets were also "of that terrorist party." *See Elahi*, 129 S.Ct. at 1738–39 ("We turn first to the question whether the [property] was a 'blocked asset.'"). And elsewhere, the *Elahi* Court referred to these assets explicitly as "belonging to" the defendant. *Id.* at 1735. These observations make clear that the necessity of ownership of the property sought to be attached was simply not an issue before the Court in *Elahi*.

In addition, there is little evidence to support the petitioners' assertion that TRIA's Notwithstanding Clause was intended to indicate pre-emption. The *Hausler* court observed, correctly, that "[o]ther courts examining the scope of TRIA § 201(a) have concluded that the 'notwithstanding' clause specifically addresses potential conflicts of sovereign immunity." *Hausler*, 740 F.Supp.2d at 531.[9]

---

**9.** The *Hausler* court then proceeded to reject

this interpretation of the Notwithstanding

And as the Supreme Court asserted in *Elahi*, "the [legislative] history suggests that Congress placed the 'notwithstanding' clause in § 201(a) ... to eliminate the effects of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of TRIA's enactment." *Elahi*, 129 S.Ct. at 1744. *See also In re Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31, 57–58 (D.D.C.2009).

Petitioners also cite to a recent decision by the Second Circuit, *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43 (2d Cir. 2010), in support of their pre-emption argument. In *Weinstein*, the Second Circuit stated in *dicta* that TRIA would abrogate a conflicting portion of an earlier treaty because the Notwithstanding Clause served to "expressly state[ ]" Congress's purpose in superseding earlier laws. *Id.* at 53. This *dicta* relates to the relationship between one form of federal law (federal statutes) and another (international treaties). It does not address the issue of implied federal pre-emption of state law. Moreover, there are no "conflicting portions" of state law that TRIA might supersede. Rather, as discussed above, state law fills an interpretive gap in TRIA by giving meaning to the phrase "of that terrorist party."

Even if one were to assume, for the sake of argument, that TRIA § 201 *does* preempt state law, the petitioners' still do not state a claim under TRIA. TRIA's plain language dictates that not all "blocked assets" are attachable. According to the Supreme Court, the word "of" denotes ownership. There is no relevant body of federal law under which petitioners can claim ownership of blocked EFTs. As discussed above, although the NKSRs provide expansive definitions for "property" and "property interests," they are silent with respect to both property ownership and property that is "of" a designated

Clause. *See Hausler*, 740 F.Supp.2d at 531.

foreign country. The petitioners therefore cannot, and do not, claim that their right to attach the blocked EFTs depends on their actual ownership.

Petitioners argue that the question of ownership of the blocked EFTs is a factual issue that awaits discovery. As a matter of law, however, TRIA § 201 *requires* property ownership. Petitioners' cannot, and therefore do not, make such a claim; their TRIA claims must therefore fail.

II. Attachable Property Under Section 1610(g) of FSIA

 The petitioners claim that the blocked accounts at respondent banks are attachable pursuant to FSIA § 1610(g). Section 1610(g) of FSIA provides the following:

> [T]he property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section regardless of—
>
> > (A) the level of economic control over the property by the government of the foreign state;
> >
> > (B) whether the profits of the property go to that government;
> >
> > (C) the degree to which officials of that government manage the property or otherwise control its daily affairs;
> >
> > (D) whether that government is the sole beneficiary in interest of the property; or
> >
> > (E) whether establishing the property as a separate entity would entitle the foreign state to benefits in United

States courts while avoiding its obligations.

28 U.S.C. § 1610(g). Section 1610(g) thus allows for the attachment of assets that are either "property of a foreign state against which a judgment is entered under section 1605A," or "the property of an agency or instrumentality of such a state." Although the judgment in petitioners' original action was entered against North Korea under FSIA § 1605A, the blocked EFTs are neither property of North Korea nor any of its agencies or instrumentalities. They are therefore not attachable under § 1610(g).

The petitioners argue that § 1610(g) is intended to allow victims of state-sponsored terrorist attacks to reach any interest whatsoever of the foreign state judgment debtor in an asset, whether direct or indirect. The plain language of § 1610(g) refutes this interpretation. Section 1610(g) requires that the blocked accounts be "property of" either North Korea or one of its agencies or instrumentalities, not a "property interest of" one of these entities.

Like TRIA § 201, FSIA § 1610(g) "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *Export–Import*, 609 F.3d at 117 (citation omitted). The method of analysis for determining whether the blocked EFTs are attachable under FSIA § 1610(g), then, is identical to that for determining whether they are attachable pursuant to TRIA § 201. First, a court must look to New York law to determine the substantive rights of North Korea in the blocked EFTs, then a court must look to federal law to determine "whether [North Korea's] state-delineated rights constitute a[n] ... interest in property sufficient to trigger application of" FSIA § 1610(g). *Id.* at 117 (citation omitted). As discussed above, under New York law, "EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank." And under FSIA § 1610(g), only "property of" North Korea or that "of an agency or instrumentality" of North Korea is subject to attachment. 28 U.S.C. § 1610(g). Just as with TRIA § 201, then, the petitioners cannot attach the blocked EFTs under FSIA § 1610(g) because neither North Korea not any of its agencies or instrumentalities owns this property.

The petitioners argue that a "key feature" of FSIA § 1610(g) is the provision allowing judgment creditors to reach "an interest held directly or indirectly in a separate juridical entity." 28 U.S.C. § 1610(g)(1). The petitioners claim that this provision allows them to attach any U.S. property in which a foreign state sponsor of terrorism has any interest whatsoever.

Petitioners' construction of FSIA § 1610(g) ignores the plain language of the statute, which allows for attachment only of "property of" North Korea or that of its agencies and instrumentalities, "*including* property that is ... an interest held directly or indirectly in a separate juridical entity." *Id.* (emphasis supplied). Thus, not all property that is "an interest held directly or indirectly in a separate juridical entity" is subject to attachment. Rather, only such property that is "of" North Korea or one of its agencies or instrumentalities is attachable. It is instructive that in this passage the preposition "of" succeeds the word "property," not the word "interest." Indeed, the words "property of" and "including" are the only words of limitation connected to the phrase "an interest held directly or indirectly in a separate juridical entity." The petitioners provide no explanation for how their construction of this section would fall anywhere short of allowing for attachment of any property held anywhere, belonging to anyone. In con-

trast to petitioners' interpretation, in using the phrase "an interest held directly or indirectly in a separate juridical entity," Congress likely sought to overcome the effect of *Dole Food Co. v. Patrickson,* 538 U.S. 468, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003), which held that an entity owned indirectly by a foreign state, through another wholly-owned entity, was not an "agency or instrumentality" of the foreign state. *See id.* at 473, 123 S.Ct. 1655 ("[A] subsidiary of an instrumentality is not itself entitled to instrumentality status.").

The petitioners also argue that, like TRIA § 201, FSIA § 1610(g) pre-empts state law. In contrast to TRIA § 201(a), however, FSIA § 1610(g) does not include a notwithstanding clause. It does not use the term "blocked assets" and define it in reference to the International Emergency Economic Powers Act or TWEA (and by implication, the relevant OFAC sanctions regulations). Rather, FSIA § 1610(g) uses the term "property" and leaves this term undefined. Thus, the main features of TRIA § 201(a) that might weigh in favor of preemption (but that, for the reasons discussed above, in fact do no such thing) are completely absent from FSIA § 1610(g). FSIA § 1610(g) does not preempt state law, and therefore the U.C.C. applies.

As with TRIA § 201, the petitioners argue that the Court should postpone ruling on their § 1610(g) claims because the question of ownership of the blocked accounts is a factual issue that awaits discovery. The petitioners have pled no facts, however, indicating that North Korea has an interest in any of the blocked accounts that *exceeds* that of an originator or beneficiary in a midstream EFT. As discussed above, such an interest is insufficient to allow for attachment under FSIA § 1610(g). Thus, the petitioners' FSIA claim fails as a matter of law.

## CONCLUSION

The petitioners have failed to demonstrate that they are entitled to relief under TRIA § 201, FSIA § 1610(g), or N.Y. C.P.L.R. §§ 5225(b) and 5227. The petition for turnover of February 18, 2011 is denied. The Clerk of Court is directed to enter judgment for respondents and to close the cases.

SO ORDERED.