09-2254-cv
*Export-Import v. Asia Pulp & Paper*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————————

August Term, 2009

(Argued: September 16, 2009     Last Supplemental Briefs Filed: November 25, 2009

Decided: June 22, 2010)

Docket No. 09-2254-cv

————————————

EXPORT-IMPORT BANK OF THE UNITED STATES,

*Plaintiff-Appellant,*

—v.—

ASIA PULP & PAPER COMPANY, LTD., PT INDAH KIAT PULP & PAPER TBK, PT PABRIK KERTAS TJIWI KIMIA TBK, PT PINDO DELI PULP & PAPER MILLS,

*Defendants-Appellees.*

————————————

Before:

STRAUB AND WESLEY, *Circuit Judges*, GARDEPHE, *District Judge*.[1]

————————————

Plaintiff-appellant appeals from a May 27, 2009 order of the United States District Court

for the Southern District of New York (Donald C. Pogue, *Judge*, United States Court of

International Trade, *sitting by designation*) quashing two writs of garnishment in connection with

---

[1] The Honorable Paul G. Gardephe, District Judge, United States District Court for the Southern District of New York, sitting by designation.

plaintiff-appellant's efforts to collect a $144 million judgment against defendants-appellees pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3205 *et seq*. This appeal requires us to determine whether a midstream electronic fund transfer ("EFT") may be subject to garnishment under the FDCPA. We AFFIRM the District Court's order and hold that an EFT temporarily in the possession of an intermediary bank in New York may not be garnished under the FDCPA to satisfy judgment debts owed by the originator or intended beneficiary of that EFT.

———————————————

LI YU, Assistant United States Attorney for the Southern District of New York (Preet Bharara, United States Attorney, and Sarah S. Normand, Assistant United States Attorney, *of counsel*) New York, NY, for *Plaintiff-Appellant*.

BENJAMIN P. DEUTSCHE (Kenneth R. Puhala, *on the brief*) Schnader, Harrison, Segal & Lewis LLP, New York, NY, for *Defendants-Appellees*.

BRUCE E. CLARK (H. Rodgin Cohen, Michael M. Wiseman, and Laurent S. Wiesel, *of counsel*) Sullivan & Cromwell LLP, New York, NY, for *Amicus Curiae The Clearing House Association L.L.C.*

———————————————

STRAUB, *Circuit Judge*:

Plaintiff Export-Import Bank of the United States ("ExIm") appeals from a May 27, 2009 order of the United States District Court for the Southern District of New York (Donald C. Pogue, *Judge*, United States Court of International Trade, *sitting by designation*) quashing two writs of garnishment in connection with ExIm's efforts to collect a $144 million judgment against defendants pursuant to the Federal Debt Collection Procedures Act ("FDCPA"), 28 U.S.C. § 3205 *et seq*. The District Court quashed the writs of garnishment to the extent they restrained electronic fund transfer ("EFT") credits at intermediary banks. For the reasons set forth below,

we affirm the District Court's order and hold that an EFT temporarily in the possession of an intermediary bank in New York may not be garnished under the FDCPA to satisfy judgment debts owed by the originator or intended beneficiary of that EFT.

**BACKGROUND**

**I.     The Parties**

ExIm, a government corporation organized and existing under federal law as the official export credit agency of the United States, 12 U.S.C. § 635 *et seq*., is the holder of over $100 million of debt owed by defendants.  ExIm is an agency of the United States and has a mandate to maintain and increase U.S. employment and to promote the export of domestic products by providing financial support for export sales to overseas buyers.  12 U.S.C. § 635.  In carrying out its mandate, ExIm offers direct loans, loan guarantees, working capital guarantees, and insurance. *Id.*  When ExIm guarantees a loan and the borrower defaults on payment obligations, ExIm pays the lender an amount up to the outstanding principal and interest on the loan.  In return, ExIm is assigned the lender's rights to the debt and any associated security interests.

Defendants together form one of the largest paper manufacturers in the world.  Defendant Asia Pulp & Paper Company, Ltd. ("APP") is the former parent company of the three other defendants in this case:  PT Indah Kiat Pulp and Paper TBK; PT Pabrik Kertas Tjiwi Kimia TBK ("Tjiwi Kimba"); and PT Pindo Deli Pulp & Paper Mills ("Pindo Deli") (collectively known as the Principal Indonesian Operating Companies ("PIOCs")).  The PIOCs are Indonesian companies, while APP is based in Singapore.

**II.     Loan Default**

The PIOCs borrowed over $100 million via thirteen different loans issued through ExIm's

direct loan and loan guarantee programs. Of these thirteen loans, twelve were private loans that ExIm guaranteed and one was issued directly to defendants by ExIm. Three of the thirteen notes also included a separate guarantee signed by APP that obligated APP as guarantor to repay the loans.

In March 2001, defendants announced a worldwide "standstill" on the repayment of over $7 billion of debt, including the thirteen loans relevant to this appeal. Upon defendants' default, ExIm fully paid the private lenders on the twelve private loans and, in return, the private lenders assigned ExIm their respective rights, title, and interest in the loans.

**III.     The District Court Proceedings**

Following defendants' default, ExIm sued for breach of contract, breach of promissory notes, and breach of guarantee and sought relief pursuant to the FDCPA. On February 6, 2008, the District Court granted ExIm's motion for summary judgment, finding that there was no dispute that defendants had defaulted on their loans and that defendants had failed to raise an issue of fact about whether their default should be excused. *Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, No. 03-8554, 2008 WL 465169, at *8 (S.D.N.Y. Feb. 6, 2008). On May 28, 2008, the District Court entered a judgment in excess of $144 million in favor of ExIm against defendants, which we subsequently affirmed. *Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, 347 F. App'x 672 (2d Cir. Sept. 30, 2009) (unpublished disposition).

On February 3, 2009, seeking to collect on the judgment, ExIm applied pursuant to the FDCPA for the issuance of writs of garnishment to retain property in which several defendants purportedly had a nonexempt interest. The following day, the District Court granted ExIm's applications, and ExIm promptly served the writs on Deutsche Bank Trust Company Americas

("Deutsche Bank") and Bank of New York Mellon Corporation ("BONY"), directing them to withhold all property in their possession, custody or control in which defendants Tjiwi Kimba and Pindo Deli, respectively, had a "substantial nonexempt interest."

On March 6, 2009, Deutsche Bank answered the writ of garnishment it had received, noting that Tjiwi Kimba did not maintain any accounts at Deutsche Bank, but that Deutsche Bank nevertheless had in its "custody, possession and control" seven EFTs "belonging to or in the name of Tjiwi Kimba," which Deutsche Bank had "intercepted and restrained" as an intermediary bank. The seven EFTs intercepted and restrained by Deutsche Bank, totaling $160,337.97, include three transfers for which Tjiwi Kimba is listed as "Originator" and four transfers for which Tjiwi Kimba is listed as "Beneficiary."

On March 27, 2009, BONY answered the writ of garnishment that it had received, stating that the only property it possessed in which Pindo Deli "may have a property interest" consisted of EFTs for which BONY "was the intermediary bank." Specifically, between February 10, 2009, and March 19, 2009, BONY received thirty-two EFT payment orders either to or from Pindo Deli. In total, BONY had in its possession $1,174,889.91 in bank credits for Pindo Deli-related EFTs.

Defendants Tjiwi Kimba and Pindo Deli objected to the answers of Deutsche Bank and BONY, respectively, arguing that (1) New York law prohibits the restraint of EFTs at intermediary banks and (2) as originator or intended beneficiary of the EFTs, neither Tjiwi Kimba nor Pindo Deli had any property interest in the EFTs restrained by Deutsche Bank and BONY. On April 17, 2009, the District Court quashed the writs of garnishment "insofar as they may have been interpreted to permit garnishment of EFTs between intermediary banks." *Export-Import*

*Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, No. 03-8554, 2009 WL 1033389, at *2 (S.D.N.Y. April 17, 2009) ("Export-Import II").

**DISCUSSION**

The present appeal requires us to determine whether an EFT temporarily in the possession of an intermediary bank in New York—*i.e.*, a midstream EFT—may be garnished under the FDCPA to satisfy judgment debts owed by either the originator or the intended beneficiary of the EFT. To answer this question we first look to New York law to determine the scope and contours of the relationship between the midstream EFT and the originator or intended beneficiary; in other words, we look to New York law to determine the interests and rights, if any, that an originator or intended beneficiary has with regard to an EFT temporarily in the possession of an intermediary bank. We then must determine as a matter of federal law whether those state-delineated interests and rights, if any, are sufficient to trigger application of the FDCPA, a federal statute that authorizes the garnishment of property in which a debtor has a "substantial . . . interest." 28 U.S.C. § 3205(a). We review these legal questions *de novo*. *Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58, 66-67 (2d Cir. 2009) (reviewing *de novo* the "threshold issue of whether EFTs are indeed 'defendant's' property"), *cert. denied*, --- S. Ct. ----, 2010 WL 182935 (Mar. 22, 2010); *see also Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991) (holding that "a court of appeals should review *de novo* a district court's determination of state law").

**I.      The Attachment of Midstream EFTs under Various Federal Statutes**

In addressing whether EFTs may be subject to garnishment or attachment in various contexts, we consider both the nature of EFTs and the legal provisions that regulate them. As we

have previously observed:

> An EFT is nothing other than an instruction to transfer funds from one account to another.  When the originator and the beneficiary each have accounts in the same bank[,] that bank simply debits the originator's account and credits the beneficiary's account.  When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium.  If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank[,] upon which the beneficiary's bank credits the beneficiary's account.  If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank.  To use an intermediary bank to complete the transfer, the banks must each have an account at the intermediary bank (or at different banks in the same consortium).  After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds.  The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account.  The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients.

*Jaldhi*, 585 F.3d at 60 n.1.

After making these observations about the nature of EFTs, we recently held that EFTs in the temporary possession of an intermediary bank cannot be subject to attachment under Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Rule B").  *Id.* at 71.  We arrived at this conclusion because Rule B authorizes the attachment only of "*defendant's . . . property*" and because midstream EFTs are the property of neither the originator nor the beneficiary of the EFT under New York law.[2]  *Id.*

---

[2]    The issue in *Jaldhi* was "whether EFTs of which a defendant is *beneficiary* are attachable property" under Rule B.  *Id.* at 64.  Thus *Jaldhi*'s holding technically only addresses whether Rule B may be used to attach an EFT of which defendant is the beneficiary.  The reasoning in *Jaldhi*, however, applies with equal force to EFTs of which a defendant is the *originator* because, as noted above, *Jaldhi* reasoned that "EFTs are *neither* the property of the originator *nor* the beneficiary while briefly in the possession of an intermediary bank" and Rule

-7-

We note that our holding and analysis in *Jaldhi* was based firmly on the specific wording and provisions of Rule B that limit attachment to property owned by the defendant. As we recognized in *Jaldhi*, EFTs that are temporarily in the possession of an intermediary bank may be seized pursuant to other federal statutes, such as 21 U.S.C. § 881, because the language and purpose of those provisions differ significantly from Rule B. *Id.* at 68-69. In contrast to Rule B, we noted that the forfeiture provisions of 21 U.S.C. § 881 require only that the EFTs "be traceable to . . . illegal activities" and do not require any "inquiry into the identity of the owner of the EFTs." *Id.* at 69. In sum, *Jaldhi* instructs that whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought.

Here, ExIm sought writs of garnishment pursuant to the FDCPA. In line with *Jaldhi*, we therefore look to the FDCPA's language to determine whether the District Court properly quashed ExIm's writs of garnishment to the extent those writs restrained EFTs at intermediary banks.

**II.     The FDCPA**

The FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt." 28 U.S.C. § 3001(a)(1). The statute was enacted "to create a comprehensive statutory framework for the collection of debts owed to the United States government" and "to improve the efficiency and speed in collecting those debts." *N.L.R.B. v. E.D.P. Med. Computer Sys., Inc.*, 6 F.3d 951, 954 (2d Cir. 1993). In contrast to Rule B, which requires that funds be the "defendant's . . . property" in order to be attached, the FDCPA

---

B authorizes the attachment only of "defendant's . . . property." *Id.* at 71 (emphasis added).

authorizes the issuance of writs of garnishment to any person in "possession, custody or control" of property "in which the debtor has a *substantial nonexempt interest*."[3] 28 U.S.C. § 3205(a) (emphasis added). Subject to several exceptions not relevant here, the FDCPA broadly defines "property" to "include[] any present or future interest, whether legal or equitable, in real, personal (including choses in action), or mixed property, tangible or intangible, vested or contingent, wherever located and however held . . . ."[4] *Id*. § 3002(12).

Although the FDCPA specifically defines the types of "property" potentially subject to garnishment, the FDCPA does not identify who has a right or interest in that property. This is unsurprising: the FDCPA—the Federal Debt Collection *Procedures* Act—is a procedural statute enacted "to give the Justice Department *uniform Federal procedures* . . . to collect debts owed the United States nationwide." H.R. Rep. No. 103-883, at 81 (1995) (emphasis added) (explaining change from pre-FDCPA scheme of reliance on diverse state procedural rules); *see also* H.R. Rep. No. 101-736 (1990) (noting that "the purported goal of creating federal legislation regarding debt collection is simply to establish uniform procedural standards"). There is no evidence, either from the statute's language or legislative history, that the FDCPA *creates* any interests or rights in property. In the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have. *E.g., Barnhill*

---

[3] Defendants do not argue that any interests they may have in the midstream EFTs are "exempt," and accordingly, we assume that the "nonexempt" limitation is not an issue and focus on the question of whether defendants have a sufficiently substantial interest in the funds to allow attachment under the FDCPA.

[4] Though not pertinent to this appeal, the FDCPA's definition of property "excludes (A) property held in trust by the United States for the benefit of an Indian tribe or individual Indian; and (B) Indian lands subject to restrictions against alienation imposed by the United States." 28 U.S.C. § 3002(12).

*v. Johnson*, 503 U.S. 393, 398 (1992). Accordingly, although the FDCPA expressly "preempt[s] State Law to the extent such law is inconsistent with a provision of [the FDCPA]," 28 U.S.C. § 3003(d), there appears to be no inconsistency between the FDCPA's procedural framework and New York state laws that govern the scope and contours of an entity's interests and rights in property. *Cf. Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc) (noting a "presumption against preemption" in "areas of law traditionally reserved to the states, like police powers and property law"). This results because the FDCPA "itself 'creates no property rights but merely attaches consequences, federally defined, to rights created under state law.'" *United States v. Craft*, 535 U.S. 274, 278 (2002) (quoting *United States v. Bess*, 357 U.S. 51, 55 (1958)) (in reference to federal tax lien statute, 26 U.S.C. § 6321).

Our analysis here—much like the analysis of the federal tax lien statute, 26 U.S.C. § 6321, another federal statute that, like the FDCPA, "creates no property rights but merely attaches consequences, federally defined, to rights created under state law," *id.*—therefore proceeds in two steps. First, we "look initially to state law to determine what rights the [judgment debtor] has in the property the Government seeks to reach."[5] *Id.* (quoting *Drye v. United States*, 528 U.S. 49, 58 (1999)). Second, we "then [look] to federal law to determine whether the [judgment debtor's] state-delineated rights," *id.* (quoting *Drye*, 528 U.S. at 58), constitute a "substantial . . . interest" in property sufficient to trigger application of the FDCPA. Although "[t]he answer to this federal

_____

[5] This approach is in accord with previous FDCPA cases. Without explicitly holding that state law is the appropriate source for determining whether and to what extent a defendant has a right or interest in property sufficient to constitute a "substantial . . . interest" in property under the FDCPA, several cases have analyzed state law and state cases when attempting to resolve the first issue. *See United States v. Santee Sioux Tribe of Neb.*, 254 F.3d 728, 735 (8th Cir. 2001); *United States v. Coluccio*, 51 F.3d 337, 341 (2d Cir. 1995).

question . . . largely depends upon state law," it is "ultimately a question of federal law" whether or not the FDCPA applies and authorizes garnishment of the judgment debtor's state-delineated property rights and interests. *See id.* Drawing upon the well known "bundle of sticks" analogy to describe property rights, "[s]tate law determines only what sticks are in a person's bundle"; federal law then dictates what may be done with that state-given bundle. *Id*. at 278-79.

It is important to highlight that the two steps of this analysis, although related, are distinct. "In looking to state law, we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them. Such state law labels are irrelevant to the federal question of which bundles of rights" amount to a substantial interest so as to be attachable under the FDCPA. *Id*. at 279. Our initial inquiry in this case is thus whether and to what extent an originator or an intended beneficiary has any interest in or right to a midstream EFT under New York law, *not* whether New York shields any such interest or right from garnishment. If at step one of our analysis we determine that an interest or right exists under state law, and if at step two we determine that interest or right to be a "substantial . . . interest" in property under the FDCPA, state law would be impotent to shield that interest or right from garnishment under the FDCPA. The FDCPA preempts state law "to the extent such law is inconsistent with a provision of this chapter," 28 U.S.C. § 3003(d), and a state law provision that shields a state-created interest or right from collection would be inconsistent with the FDCPA provisions that authorize garnishment of property in which the defendant has a "substantial . . . interest," 28 U.S.C. § 3205(a).[6]

---

[6] Although as a general matter the FDCPA preempts inconsistent state law, *see* 28 § 3003(d), it nevertheless preserves state law restrictions on garnishment to the extent that they pertain to "co-owned property," *see id.* § 3205(a) ("co-owned property" may be garnished only

**III.    Whether an Originator or Intended Beneficiary Has a "Substantial . . . Interest" in a Midstream EFT under the FDCPA**

Applying the two-step framework outlined above, we conclude that whatever interest or right an originator or intended beneficiary has in a midstream EFT under New York law, if any, it is insufficient to constitute a "substantial . . . interest" under the FDCPA.

Article 4-A of New York's Uniform Commercial Code ("Article 4-A") governs EFTs, N.Y. U.C.C. § 4-A-102, and was enacted to provide a "comprehensive body of law that defines the rights and obligations that arise from wire transfers," *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 369 (1991). The system Article 4-A establishes is not intuitive. As various provisions of Article 4-A make clear, wire transfers, which include EFTs, are a unique type of transaction to which ordinary rules do not necessarily apply. *See, e.g.*, N.Y. U.C.C. § 4-A-102 cmt. (stating that the provisions of Article 4-A "are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties" to covered EFT transactions); *Banque Worms*, 77 N.Y.2d at 369 (noting that "attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in [other more traditional areas of law] have not been satisfactory").

---

"to the same extent as . . . under the law of the State in which such property is located"). After reasoning that an EFT temporarily in the possession of an intermediary bank is "co-owned" by both the originator and the intended beneficiary, the District Court quashed the writs of garnishment in the present case because of New York law's prohibition on the attachment of midstream EFTs. *Export-Import II*, 2009 WL 1033389, at *2. Subsequently, however, we held that *neither* an originator nor a beneficiary owns an EFT while it is temporarily in the possession of an intermediary bank. *Jaldhi*, 585 F.3d at 69 ("For maritime attachments under Rule B . . . the question of ownership is critical"); *id.* at 71 ("Taken together, these provisions of New York law establish that EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank."). Accordingly, the District Court's reasoning is no longer persuasive.

Pursuant to Article 4-A, "[a] receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and the bank owes no duty to any other party to the funds transfer except as provided in this article or by express agreement." N.Y. U.C.C. § 4-A-212. An authoritative comment accompanying Article 4-A further states that a creditor of an originator may serve process on an originator's bank *before* a funds transfer is initiated, but not afterwards, because "no property of the originator is being transferred" during the funds transfer process. N.Y. U.C.C. § 4-A-502 cmt. 4; *see Jaldhi*, 585 F.3d at 71 (describing the above comment as "authoritative"). Likewise, "until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach." N.Y. U.C.C. § 4-A-502 cmt. 4.[7]

Recent commentary of the Permanent Editorial Board for the Uniform Commercial Code

[7] New York is not unique in its adoption of Article 4-A. In fact, Article 4-A has been adopted by every state, as well as by the Board of Governors of the Federal Reserve System. *See* PEB Commentary No. 16 at 3-4. Article 4-A, and its intent to shield EFTs from midstream attachment, thus governs funds transfers made via the Federal Reserve's Fedwire system. *See* 12 C.F.R. § 210.25. Such transfers, however, are not at issue here. Fedwire is one of several wire payment systems; one of the other payment systems is the Clearing House Interbank Payments System ("CHIPS"), which is owned and operated by the New York Clearing House Association. *Banque Worms*, 77 N.Y.2d at 370 & n.2. Of the two, CHIPS is more frequently used for international transactions. *See id*. at 370.

ExIm asserts in its opening brief that all of the EFTs restrained in this case were international fund transfers made via CHIPS. By contrast, amicus curiae, the Clearing House Association L.L.C., suggests that three of the thirty-two EFTs restrained by BONY were in fact made through Fedwire. Defendants, however, have never so argued, either to us or below; to the contrary, defendants affirmatively assert that "[t]he funds at issue on this appeal were transferred through the CHIPS network." Brief of Defendants at 6. Accordingly, defendants have waived any potential argument that these three EFTs should be shielded from garnishment by virtue of having been transferred via Fedwire.

("PEB"), which drafted the U.C.C.,[8] notes:

> Under Article 4A . . . the originator does not have any claim against the intermediary bank for return of the value in the event the funds transfer is not completed. Rather, the only party with a claim against the intermediary bank is the sender to that bank, which is typically the originator's bank. . . . The originator's bank must refund to the originator even if it cannot recover from the intermediary bank. The beneficiary likewise has no claim to any payment from the intermediary bank.

PEB Commentary No. 16, §§ 4A-502(d) and 4A-503, at 3 (2009). According to the PEB, this is so because

> [t]he intermediary bank has no contractual obligation to the originator or to the beneficiary, and neither the originator nor the beneficiary has any contractual obligation to or rights flowing from the intermediary bank. Thus, credits in an intermediary bank are credits in favor of the originator's bank, and are not property of either the originator or the beneficiary.

*Id*. at 2 (emphasis omitted). All of this is just to say that, according to the PEB,

> under the Article 4A structure, the issuance and acceptance of payment orders creates rights and obligations only as between the sender of the payment order and its receiving bank (e.g., between originator and originator's bank as to the originator's payment order), between the originator's bank and an intermediary bank as to the originator's bank's payment order, between the intermediary bank and the beneficiary bank as to the intermediary bank's payment order, and finally,

---

[8] The PEB is a joint committee of the American Law Institute and the Uniform Law Commission (also known as the National Conference of Commissioners on Uniform State Laws) that "assists in attaining and maintaining uniformity in state statutes governing commercial transactions by discouraging non-uniform amendments to the Uniform Commercial Code by the states, and by approving and promulgating amendments to the UCC when necessary." http://www.ali.org (follow "Projects" hyperlink; then follow "Permanent Editorial Board for the UCC" hyperlink) (last visited June 21, 2010); PEB Commentary No. 16, at preface. As the New York Court of Appeals has noted, it was "the National Conference of Commissioners on Uniform State Laws (NCCUSL) and the American Law Institute (ALI) [that] undertook to develop . . . [A]rticle 4A of the Uniform Commercial Code," which was then "adopted . . . and incorporated . . . into the New York Uniform Commercial Code." *Banque Worms*, 77 N.Y.2d at 371.

as between the beneficiary bank that has accepted a payment order and that beneficiary.

*Id*.

We have readily determined that these various provisions and commentary "establish that EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank." *Shipping Corp. of India Ltd. v. Jaldhi Overseas Ptd Ltd.,* 585 F.3d 58, 71 (2d Cir. 2009), *cert. denied* --- S. Ct. ----, 2010 WL 182935 (Mar. 22, 2010). Resolution of the "ownership" issue, however, does not definitively answer our threshold question concerning the existence and scope of an originator or intended beneficiary's right or interest, if any, in a midstream EFT. An "interest" in property is not necessarily synonymous with "title to" or "ownership of" property. *See, e.g.*, BLACK'S LAW DICTIONARY 149 (7th ed. 1999) (defining a "beneficial interest" as "[a] right or expectancy in something . . . , as opposed to legal title in that thing"). Indeed, we have recognized that it would be reasonable for a court to hold that an individual has an interest in property, even when he does not own that property, so long as the property benefitted him as if he had received the property directly. *United States v. Coluccio*, 51 F.3d 337, 341 (2d Cir. 1995).

Noting that "[t]he terms 'interest' and 'title' are clearly not synonymous," the Appellate Division of the New York Supreme Court has stated that, although Article 4-A establishes that neither an originator nor a beneficiary owns or has title to a midstream EFT, Article 4-A does *not* address the separate issue of who has an "*interest*" in an EFT. *Bank of N.Y. v. Nickel*, 14 A.D.3d 140, 145-47 (N.Y. App. Div. 1st Dep't 2004). The *Nickel* court found no conflict between

Article 4-A—which, it says, governs only passage of "title"—and a different federal statute that authorized the blocking or freezing of certain entities' "interests" in property. *Id*. at 147. According to the *Nickel* court, Article 4-A and the federal statute that authorized the freezing of certain entities' EFTs "simply addressed different issues."[9] *Id*.

Even though, according to *Nickel*, Article 4-A does not directly or explicitly address whether an originator or intended beneficiary has an "interest" in a midstream EFT, Article 4-A undoubtedly addresses some related issues and imposes significant limitations on the rights and expected benefits associated with such EFTs. First, as already noted, an intermediary bank is the legal agent of neither the originator nor the intended beneficiary. N.Y. U.C.C. § 4-A-212. Second, an originator and intended beneficiary have no legal claim or contractual rights against an intermediary bank in the event that a funds transfer is not completed. *See Grain Traders, Inc.*

[9] We pause to reiterate that we look to state law only to determine whether and to what extent an entity has an interest or a right in a midstream EFT and that we look to federal law to determine whether that state-delineated interest or right, if any, constitutes a "substantial . . . interest" under the FDCPA. To the extent the *Nickel* court was simply stating that Article 4-A does not address the federal law issue of whether an entity has an "interest" in property, as that term is defined by a federal statute, we understand the *Nickel* court to be addressing a different issue from our present inquiry. Our threshold inquiry is not whether Article 4-A addresses the federal law issue of whether an originator or beneficiary has a "substantial . . . interest" in a midstream EFT under the FDCPA; our threshold inquiry is whether an originator or intended beneficiary has any interest or right in a midstream EFT under *state* law.

In addition, we express no opinion about whether the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, and its accompanying regulations—the statute and regulations at issue in *Nickel*—supersede state law governing substantive property rights. The IEEPA empowers the President to block the property and interests in property of nationals of countries that are involved in "any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States." 50 U.S.C. §§ 1701(a), 1702(a)(1)(B). Regulations that accompany the IEEPA often specifically define the terms "property" and "interest" in property, *see, e.g.*, 31 CFR §§ 585.303, 585.304, and the IEEPA's purpose differs considerably from the procedural nature and purpose of the FDCPA.

-16-

*v. Citibank, N.A.*, 160 F.3d 97, 101-02 (2d Cir. 1998); PEB Commentary No. 16, §§ 4A-502(d) and 4A-503, at 3. Finally, although an originator or intended beneficiary's lack of "ownership" is not dispositive of whether they have an interest in a midstream EFT, it nevertheless suggests that whatever interests or rights exist, if any, are limited.

Based on these limitations, we conclude that whatever interest or right an originator or intended beneficiary has in a midstream EFT under New York law, it is insufficient to constitute a "substantial . . . interest" under the FDCPA. Because neither the statutory language nor the legislative history of the FDCPA defines the phrase "substantial . . . interest," we look to the common, ordinary definition of the words. *See generally Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Some of the common definitions of "substantial" include "essential," "material," "firmly or solidly established," and "weighty." 17 OXFORD ENGLISH DICTIONARY 67 (2d ed. 1989). Our analysis of whether a right or interest in property constitutes a "substantial . . . interest" is further guided by how "direct and tangible" an originator or beneficiary's benefit from the property appears. *See Coluccio*, 51 F.3d at 341 (noting that the benefit the judgment debtor received from the property was significantly less "direct and tangible" than the benefit involved in other cases and remanding to the district court for further findings).

Although originators and intended beneficiaries presumably derive some benefit from midstream EFTs—as EFTs are frequently used and destined to satisfy debts owed by the originator to the intended beneficiary—this benefit is insufficient to qualify as a "substantial . . .

interest" under the FDCPA. We have recognized that it would be reasonable for a court to hold that a judgment debtor has an interest in funds, even though he never acquired "physical possession" of those funds, if the funds "benefitted him as if he had received the money directly." *Coluccio*, 51 F.3d at 341. While an EFT is temporarily in the possession of an intermediary bank, however, that EFT clearly does not benefit the originator or intended beneficiary in the same way as if they had received the money directly. As noted earlier, neither an originator nor an intended beneficiary own an EFT while it is temporarily in the possession of an intermediary bank; they cannot seek a refund from the intermediary bank if the funds transfer is not completed; and an intermediary bank is not the agent of either the originator or the intended beneficiary. For these reasons, we conclude that an originator or intended beneficiary's interests and rights in a midstream EFT, if any, are not sufficiently "essential," "material," "firmly or solidly established," "weighty," or "direct and tangible," to constitute a "substantial . . . interest" under the FDCPA. Accordingly, we hold that an EFT temporarily in the possession of an intermediary bank may not be garnished under the FDCPA to satisfy judgment debts owed by the beneficiary or originator of that EFT.

## CONCLUSION

For the reasons stated above, the order of the District Court is AFFIRMED.