**Ana Margarita MARTINEZ, Plaintiff,**

v.

**REPUBLIC OF CUBA, Defendant.**

**07 Civ. 6607 (VM)**

United States District Court, S.D. New York.

Signed February 01, 2016

**DECISION AND ORDER**

VICTOR MARRERO, United States District Judge.

Petitioner Ana Margarita Martinez ("Martinez") brought this turnover action pursuant to Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), 28 U.S.C. Section 1610 *note*, to execute on a default judgment obtained by Martinez in Florida state court in 2001 ("Florida Judgment") against the Republic of Cuba ("Cuba") for intentional torture and sexual battery committed against her by Martinez's husband, a Cuban spy. To enforce her judgment, Martinez filed a turnover petition ("Petition") in this Court against the New York branches of [redacted] and [redacted] (collectively, "Garnishee"). (Dkt. No. 75.)

The Court granted Martinez's Petition by Order dated September 24, 2015 but stayed it on the United States' motion, permitting the United States to file a Statement of Interest informing the Court of its views on issues relevant to Martinez's Petition. (Dkt. No. 76.) The Government subsequently submitted a Statement of Interest opposing turnover ("Statement of Interest"). (Dkt. No. 79.) Martinez filed an opposition to the United States' Statement of Interest ("Plaintiff's Opposition") (Dkt. No. 84) that cited the recent decision in *Vera v. Republic of Cuba*, 12 Civ. 1596 (S.D.N.Y. Sept. 24, 2015). With permission of the Court, the United States submitted an additional Statement of Interest responding to issues raised by the *Vera* decision, ("Supplemental Statement") (Dkt. No. 97), to which Martinez replied. (Dkt. No. 99.) The Court has received no further submissions.

Upon review of the Government's Statement of Interest and Supplemental Statement of Interest and Martinez's opposing papers, the Court finds that Martinez has not shown that the blocked electronic funds transfers ("EFTs") at issue are subject to execution under TRIA. Accordingly, the Court denies Martinez's Petition.

## I. BACKGROUND [1]

### A. MARTINEZ'S JUDGMENT AGAINST CUBA

Martinez seeks to enforce the Florida Judgment for compensatory damages in the amount of $12,197,102.60 plus post-

1. The factual summary below is derived primarily from the following documents and any attached *exhibits: Verified* Uncontested, Under Seal Motion for Turnover Order re: [redacted], dated September 24, 2015 (Dkt. No. 75); Statement of Interest of the United States, dated October 16, 2015 (Dkt. No. 79); Plaintiff's Response in Opposition to Statement of Interest of the United States, dated October 30, 2015 (Dkt. No. 84); Supplemental Statement of Interest of the United States, filed December 14, 2015 (Dkt. No. 97); Plaintiff's *Response in Opposition to United States' Supplemental Statement of Interest* filed December 21, 2015 (Dkt. No. 99). Except where specifically referenced, this Decision Order will make no further citation to these sources.

judgment interest.[2] The Florida Judgment, recognized by the United States District Court for the Southern District of Florida and given full faith and credit by this Court on December 7, 2007, arose out of Martinez's civil judgment against Cuba for intentional torture and sexual battery committed against Martinez by her husband while he lived in the United States as an agent for Cuba. The Court entered a default judgment on behalf of Martinez after Cuba declined to appear or answer, and it issued a Writ of Execution to enable Martinez to enforce the judgment several months later.

Several years elapsed before Martinez learned, by way of a third party subpoena served on the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), of blocked assets held at Garnishee's New York branch under the Cuban Asset Control Regulations ("CACRs"). After Garnishee failed to timely respond to a writ of execution issued on April 6, 2015, Martinez filed a subpoena seeking information about accounts blocked under the CACRs. Pursuant to an agreement with Garnishee, Garnishee agreed 1) not to oppose Martinez's motion for turnover and 2) to respond to two out of three demands for reports and documentation in the subpoena. In turn, Martinez agreed to withdraw the third demand for information, which asked for [redacted]

Garnishee then responded to the subpoena with information about seven blocked accounts totaling $[redacted] ("Account Summary"). Each account contains funds blocked while passing through Garnishee's New York branch and held in an interest-bearing account. The Account Summary includes the following information about each account: 1) the originator of the funds transfer; 2) the originating bank; 3) the intermediary bank; 4) the beneficiary bank; and 5) the beneficiary. Two of the accounts, Account One and Account Two, contain no identifying information about the originator of the funds transfer, and Account One also contains no identifying information about the beneficiary bank.

■ Martinez petitioned the Court, pursuant to Rule 69 of the Federal Rules of Civil Procedure ("Rule 69"), for turnover of the funds in all seven accounts under New York Civil Practice Law and Rules ("N.Y.C.P.L.R.") Section 5225(b). Rule 69 provides that the procedure for judgment execution must accord with the procedure of the state where the court is located. Fed.R.Civ.P. 69(a)(1). Under New York state law, a judgment creditor may bring a special proceeding against a third party in possession of a debtor's funds. A court must order the third party to pay over the funds "where it is shown that the judgment debtor is entitled to the possession of such property." N.Y. C.P.L.R. § 5225(b).

The third party here—Garnishee—does not contest the turnover petition. The United States Department of Justice, however, intervened to oppose turnover pursuant to 28 U.S.C. Section 517, which permits "any officer of the Department of Justice .... to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517. The United States describes its interest in this case as "ensuring the effectiveness and lawful administration of the

---

**2.** Martinez's compensatory damages award was $7,175,000. Deducting payments previously made and adding pre-judgment interest at the Florida statutory rate brought the total judgment to $12,197,102.60. (Dkt. No. 16.)

Martinet's judgment also includes $20 million in punitive damages; however, TRIA Section 201 permits attachment only to the extent of compensatory damages. TRIA § 201(a).

CACRs," particularly considering "the Administration's intent to normalize bilateral relations between the United States and Cuba." (Statement of Interest, Dkt. No. 79, at 1–2.) It asserts a further interest in ensuring the correct construction of laws relating to foreign sovereign immunity and enforcement of judgments against the property of foreign states. Courts have noted that blocked assets play an important role in the conduct of United States foreign policy, encouraging deference to views of the executive branch. *See Republic of Austria v. Altmann*, 541 U.S. 677, 701–02, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004); *Estate of Heiser v. Islamic Rep. of Iran*, 885 F.Supp.2d 429, 440–41 (D.D.C. 2012).

### B. *CUBAN ASSET CONTROL REGULATIONS*

The blocked assets Martinez seeks to attach are frozen pursuant to the CACRs, codified at 31 C.F.R. Part 515. The CACRs were issued in 1963 pursuant to the Trading with the Enemy Act ("TWEA"), 50 U.S.C. app Section 5(b), which authorizes the executive branch to restrict trade with foreign nations designated as hostile to the United States. The International Emergency Powers Act ("IEEPA"), 50 U.S.C. Section 1701, limited the executive's powers to apply trade restrictions in peacetime but permitted measures issued pursuant to Section 5(b) prior to 1977 to remain in effect. The CACRs have been extended each year, with some modification, since 1977.

The CACRs prohibit a broad category of transactions involving "property in which [Cuba] ... has at any time on or since [July 8, 1963] had any interest of any nature whatsoever, direct or indirect." 31

C.F.R. Section 515.201(a). Transactions that may be blocked under the CACRs are listed at Section 515.201:

(1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States; (31 C.F.R. § 515.201(a)(1)); "[a]ll dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States." 31 C.F.R. § 515.201(b)(1).

Section 515.205 of the CACRs requires that certain types of blocked property, including funds resulting from transactions blocked pursuant to CACRs Section 515.201, be held in interest-bearing domestic bank accounts. Unless an exception applies, a license must be obtained through OFAC to attach assets blocked under the CACRs. 31 C.F.R. 515 § 201.

### C. *FOREIGN SOVEREIGN IMMUNITIES ACT AND TERRORISM RISK INSURANCE ACT*

Martinez's judgment against Cuba was authorized under the Foreign Sovereign Immunities Act, 28 U.S.C. Section 1602 *et seq.* ("FSIA"). The FSIA immunizes foreign states from suit in United States courts unless an exception enumerated in Sections 1605 through 1607 of FSIA applies. 28 U.S.C. § 1604. One of these exceptions is the "terrorism exception," codified at 28 U.S.C. Section 1605A[3], which

---

**3.** Martinez filed suit against Cuba under an earlier version of this provision, 28 U.S.C. Section 1605(a)(7). In 2008, 28 U.S.C. Section 1605A superseded Section 1505(a)(7), creating a private right of action for U.S. citizens injured by designated state sponsors

creates an exception to sovereign immunity against judgment for certain acts by designated state sponsors of terrorism.[4] Foreign states are also generally immune to execution in aid of attachment on federal and state judgments, but FSIA Section 1610(g) abrogates sovereign immunity against execution for judgments under Section 1605A. Section 1610(g) makes "property of a foreign state ... and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity..." subject to attachment in aid of execution. 28 U.S.C. § 1610(g)(1).

Martinez seeks to attach funds held in the blocked accounts through a provision of the Terrorism Risk Insurance Act ("TRIA"). TRIA gives plaintiffs who hold judgments against designated state sponsors of terrorism additional avenues for enforcing their judgments. Section 201 of TRIA permits a judgment holder to circumvent the usual procedure for attaching assets blocked under the CACRs or another sanctions program, which entails obtaining a license from OFAC. Section 201(a) of TRIA provides that:

> Notwithstanding any other provision of law ... in every case in which a person has obtained a judgment against a terrorist party on a claim based on an act of terrorism, or for which a terrorist party is not immune under 28 U.S.C. § 1605A, *the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in the aid of*

*execution* in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable. TRIA Section 201(a) (emphasis added).

Section 201(d)(2) of TRIA defines "blocked asset" as "any asset seized or frozen by the United States under [Section 5(b) ] of the [TWEA] or under sections 202 and 203 of the [IEEPA]" TRIA § 201(d)(2).

The category of blocked assets subject to execution or attachment under TRIA is significantly narrower than the category of property blocked under the CACRs: where the CACRs block property in which Cuba "had any interest of any nature whatsoever, direct or indirect", 31 C.F.R. 515 § 201(a), TRIA permits attachment only of blocked assets "of [the] terrorist party" or of any agency or instrumentality of the terrorist party. TRIA § 201(a).

The disputed issue in this case is whether Martinez has shown that the blocked funds she seeks to attach are "assets of" Cuba or a Cuban agency or instrumentality as defined by TRIA. The United States argues that none of the seven blocked accounts are attachable Cuban assets under the Second Circuit's recent interpretation of TRIA.

### D. *RECENT SECOND CIRCUIT CASE LAW ON TRIA*

Two Second Circuit decisions since 2014 have concluded that judgment creditors may attach and execute blocked assets under TRIA only if those blocked assets

---

of terrorism. Section 1605A provides for the same exceptions to foreign sovereign immunity as Section 1605(a)(7). *See Weinstein v. Islamic Republic of Iran,* 609 F.3d 43, 55 n. 4 (2d Cir.2010).

4. At the time the acts giving rise to Martinez's claim took place between 1992 and 1996, as

well as at the time Martinez's judgment was awarded in 2001, Cuba was designated a state sponsor of terrorism, *see* 47 Fed.Reg. 16,623 (Apr. 19, 1982), although it is no longer so designated. *See* Rescission of Determination Regarding Cuba, 80 Fed.Reg. 31945 (June 4, 2015).

qualify as property of the judgment debtor under state law.

In *Calderon–Cardona v. Bank of New York Mellon*, the Second Circuit held that 28 U.S.C. Section 1610(g) requires federal courts to look to state law to decide what constitutes "property of" a foreign state subject to execution. 770 F.3d 993 (2d Cir.2014), *cert. denied*, —— U.S. ——, 136 S.Ct. 893, 193 L.Ed.2d 809 (2016). The Circuit Court relied on its previous decisions in *Export–Import Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111 (2d Cir.2010) ("Asia Pulp") and *Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58 (2d Cir.2009) ("Jaldhi"), in which it considered to what extent EFTs were attachable assets while briefly passing through a domestic bank to complete a transaction between two foreign banks.[5] The Second Circuit reiterated in *Calderon–Cardona* that "whether or not midstream EFTs may be attached or seized depends on the nature and wording of the statute pursuant to which attachment and

seizure is sought." 770 F.3d at 1001 (*citing Asia Pulp*, 609 F.3d at 116).

Looking to New York's Uniform Commercial Code to determine the property interests held by parties in an EFT blocked mid-stream, the Circuit Court found that "the only entity with a property interest in an EFT while it is midstream is the entity immediately preceding the bank 'holding' the EFT in the transaction chain." *Id.* Therefore, an EFT blocked midstream is property of a foreign state subject to attachment "only where either the state itself or an agency or instrumentality thereof ... transmitted the EFT directly to the bank where the EFT is held pursuant to the block." *Id.* at 1002.

In *Hausler v. JP Morgan Chase Bank N.A.*, the Second Circuit extended *Calderon–Cardona*'s holding to claims under Section 201 of TRIA. 770 F.3d 207 (2d Cir.2014), *cert. denied*, —— U.S. ——, 136 S.Ct. 893, 193 L.Ed.2d 809 (2016). Petitioner Hausler sought to enforce a judgment

5. The term "electronic funds transfer" or "EFT" refers generally to payment or transfer by electronic transmission. Under New York law, EFTs between financial institutions are covered, along with written and oral transmissions of funds, under New York's Uniform Commercial Code Article 4–A, discussed at Section II(b), *infra*. ("Most payments covered by Article 4A are commonly referred to as wire transfers and usually involve some kind of electronic transmission, but the applicability of Article 4A does not depend upon the means used to transmit the instruction of the sender.") N.Y. U.C.C. Law § 4–A–104. The Second Circuit has also explained in detail several ways in which an EFT can function:

An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank that bank simply debits the originator's account and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the

banks are members of the same wire transfer consortium. If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account. If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank. To use an intermediary bank to complete the transfer, the banks must each have an account at the intermediary bank (or at different banks in the same consortium). After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account. The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients. *Jaldhi*, 585 F.3d at 60 n. 1.

against Cuba by attaching EFTs blocked at intermediary U.S. banks en route to beneficiary Cuban banks. The garnishee banks argued that Cuba had no property interest in the EFTs and moved to dismiss the turnover petition and intervene in the case. Applying the reasoning of *Calderon–Cardona*, the Second Circuit found that state law governs whether blocked EFTs are "assets of" a Cuban state or instrumentality and therefore subject to attachment under TRIA Section 201. *Id.* at 212. The court held that "in order for an EFT to be a 'blocked asset of' Cuba under TRIA Section 201(a), either Cuba itself or an agency or instrumentality thereof (such as a state-owned financial institution) [must have] transmitted the EFT directly to the bank where the EFT is held pursuant to the block." *Id.*

The parties here dispute whether *Calderon–Cardona* and *Hausler* apply to the Petition, and, if they do apply, whether in accordance with those decisions Martinez is entitled to attach the blocked Garnishee funds. Martinez asked the Court to grant her petition for turnover on Accounts One and Two and to reserve ruling on Accounts Three through Seven until the Supreme Court decided whether to grant certiorari in *Calderon–Cardona* and *Hausler*. On January 19, 2016, the Supreme Court denied certiorari in both cases.

## II. DISCUSSION

■ The assets held at the Garnishee bank comprise the proceeds of blocked EFTs maintained in seven different interest-bearing accounts. The seven accounts can be divided into two groups for purposes of analyzing the issues in this matter—whether *Calderon–Cardona* and *Hausler* apply and whether Martinez's turnover petition may be granted under Second Circuit law as stated in those decisions. Martinez has raised certain arguments with respect to Accounts One and Two, which lack originator information, but has not raised those arguments with respect to Accounts Three through Seven. The Court will address Accounts Three through Seven first, followed by Accounts One and Two.

## A. ACCOUNTS THREE THROUGH SEVEN

Five of the Garnishee accounts include complete information about the EFTs blocked mid-transfer, identifying all individuals or entities between whom the EFT was to be processed. For those accounts, the Account Summary includes information about the originator, the originating bank, the intermediary bank, the beneficiary bank, and the beneficiary of the EFT.

In her Petition, Martinez offers evidence that a Cuban entity was the downstream beneficiary of each of the transactions blocked while being transferred through Garnishee, the intermediary bank. (Dkt. No. 75 at 8.) Specifically, Accounts Three and Four contain funds directed from a non-Cuban bank to [redacted] and an individual. Account Five contains funds directed from non-Cuban bank to [redacted] as the beneficiary bank, with an individual identified as the beneficiary. Account Six lists a state-owned [redacted] as the beneficiary of an account at a non-Cuban bank. Account Seven contains funds transmitted from [redacted]. (Dkt. No. 75 at 9–12.) On this basis, Martinez contends that she is entitled under 28 U.S.C. Section 1610(g) and TRIA Section 201 to execute on the blocked funds held in the accounts.

■ Under Second Circuit law as stated in *Calderon–Cardona* and *Hausler*, blocked EFTs held in New York banks are not subject to attachment when the judgment debtor is the beneficiary of the blocked EFT. "[T]he only entity with a property interest in the stopped EFT is

the entity that passed the EFT on to the bank where it presently rests." *Hausler*, 770 F.3d at 212; *see also Calderon–Cardona*, 770 F.3d at 1001; *Estate of Heiser v. HSBC Bank USA, N.A.*, No. 11 Civ. 1607, 2014 WL 6468977, at \*3 (S.D.N.Y. Nov. 18, 2014). The burden rests on the petitioner to show that the judgment debtor owns the property petitioner is seeking to attach. *See Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir.2013). Martinez does not argue in her briefing that the originator of any of the EFTs in Accounts Three through Seven is a Cuban agency or instrumentality. (*See* Plaintiff's Opposition, Dkt. No. 84, at 9 ("As to [Accounts Three through Seven], the Second Circuit's opinions are arguably applicable if the Supreme Court accepts or denies certiorari review.")) Nor does any evidence presented in the Account Summary or other exhibits to the Petition or Plaintiff's Opposition suggest that the originators are Cuban agents or instrumentalities.

As to these accounts, then, Petitioner has not shown that the blocked EFTs were transmitted to the Garnishee bank directly by Cuba or one of its agents or instrumentalities. Accordingly, the Court is persuaded that the proceeds of the blocked EFTs held in Accounts Three through Seven are not "assets of" Cuba or a Cuban entity attachable under TRIA Section 201. Martinez's Petition must therefore be denied as to those accounts.

## B. *ACCOUNTS ONE AND TWO*

Two of the blocked accounts identified by Garnishee, Accounts One and Two, are missing identifying information about the originator. Account One also lacks information identifying the beneficiary bank. (Dkt. No. 75, Ex. D at 1.) Both accounts identify [redacted] a Cuban state-owned [redacted], as the beneficiary. Martinez's briefing focuses on these two accounts. She asserts that *Calderon–Cardona* and *Hausler* are inapplicable here because the transfers held in Accounts One and Two are "book transfers" between accounts at the same bank rather than "bank-to-bank transfers" between unrelated banks. Martinez puts forth an alternative argument based on factual similarities between this case and *Vera v. Republic of Cuba*, 12 Civ. 1596 (S.D.N.Y. Sept. 24, 2015), which, she argues, suggests that Accounts One and Two should be presumed the property of Cuba and turned over to Petitioner even if *Calderon–Cardona* and *Hausler* do apply.

### a. *APPLICATION OF CALDERON–CARDONA AND HAUSLER*

The United States argues that under *Calderon–Cardona* and *Hausler*, Martinez cannot attach the assets in any of the blocked Garnishee accounts because she has not shown that "either Cuba itself or an agency or instrumentality thereof ... transmitted the EFT directly to the bank where the EFT is held pursuant to the block" as required under TRIA Section 201 and FSIA Section 1610(g). (Dkt. No. 79 at 12–15.)

Martinez's position is that the holdings of *Calderon–Cardona* and *Hausler* are limited to cases where an EFT is blocked while passing through an intermediary bank used as a link between unrelated banks. (*See* Plaintiff's Opposition, Dkt. No. 84, at 10 (" *Calderon–Cardona* and its progeny can only apply to cases in which a correspondent bank/intermediary bank is employed".)) She asserts that the transfers blocked in Accounts One and Two are "book transfers" blocked mid-transfer between two branches of Garnishee bank rather than "bank-to-bank transfers" between two independent banks. This distinction is critical, she argues, because "[t]he holdings in *Calderon–Cardona* and

*Hausler* are tied inextricably and exclusively to bank-to-bank transfers." (Dkt. No. 99, at 7.)

The Court is not persuaded that *Calderon–Cardona* and *Hausler* apply in the limited manner Martinez suggests. The underlying question in *Calderon–Cardona* was whether certain blocked EFTs were property of a state sponsor of terrorism subject to execution under Section 1610(g). To decide that question, the Second Circuit first had to decide whether Section 1610(g) of FSIA pre-empts state law. The Circuit Court found explicitly that it did not: "[w]e hold that FSIA § 1610(g) does not preempt state law applicable to the execution of judgments in this case." *Calderon–Cardona*, 770 F.3d at 1001. It further held that state law governs the definition of property under 1610(g), noting that "absent any indication that Congress intended a special definition of the term, 'property' interests are ordinarily those created and defined by state law." *Id.* *Hausler* similarly held that state property law governed the definition of property subject to TRIA. The Second Circuit stated that "[a]s with FSIA § 1610(g), Congress did not define the type of property interests that may be subject to attachment under TRIA § 201(a). . . . [W]e must look to state law to define the rights the judgment debtor has in the property the [creditor] seeks to reach." *Hausler*, 770 F.3d at 211 (*quoting Calderon–Cardona*, 770 F.3d at 1001).

These two decisions dictate that courts determining whether blocked assets are attachable must, in all instances, look to state law to decide who holds a property interest in the assets. If, as Martinez suggests, the holding of *Calderon–Cardona* applied only to bank-to-bank transfers, the resulting rule would be difficult to apply: courts would have to first look to the exact nature of the funds transfer before deciding whether or not to apply state

law to determines property rights. Martinez does not propose what other body of law would then govern determinations of property rights for book transfers. The Court is persuaded that a more straightforward reading of Second Circuit law is appropriate.

Martinez identifies several distinctions between the mechanics of the blocked transfers in Accounts One and Two and those described in other Second Circuit decisions interpreting EFTs. In those cases, though, courts discussed transfers between unrelated banks because those particular types of transactions were before them; here, the court must look at how state law applies to the series of transactions listed in the Account Summary. It remains the case that under Second Circuit law the Court must look to New York property codes to determine whether the blocked EFTs in these accounts are the property of Cuba or a Cuban agency or instrumentality.

### b. *UNDER NEW YORK LAW, AC-COUNTS ONE AND TWO ARE NOT PROPERTY OF CUBA*

*Calderon–Cardona* and *Hausler* direct the Court to look to state law to decide whether Cuba has a property interest in the proceeds of the blocked funds transfers. *Calderon–Cardona*, 770 F.3d at 1001; *Hausler*, 770 F.3d at 211. The Second Circuit has previously observed that New York state law concerning funds transfers is detailed in New York's Uniform Commercial Code ("N.Y.U.C.C."), Ch. 38, Article 4–A ("Article 4–A"). *See Asia Pulp*, 609 F.3d at 118. Article 4–A was ("enacted to provide a comprehensive body of law that defines the rights and obligations that arise from wire transfers"); *Jaldhi*, 585 F.3d at 70. Pursuant to Article 4–A,

'Funds transfer' means the series of transactions, beginning with the origina-

tor's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order. N.Y. U.C.C. § 4-A-104.

Martinez disputes the classification of the funds in the Garnishee accounts as EFTs blocked mid-stream; however, the Article 4-A definition reaches all transfers made within the banking system regardless of whether the transfers are between branches of the same bank. *See* N.Y. U.C.C. § 4-A-104 cmt. 1 (explaining that "a payment under Article 4A involves an overall transaction, the funds transfer, in which the originator, X, is making payment to the beneficiary, Y, but the funds transfer may encompass a series of payment orders that are issued in order to effect the payment order"). The Second Circuit has also defined an EFT as "nothing other than an instruction to transfer funds from one account to another." *Jaldhi*, 585 F.3d at 58. The distinction Martinez draws between the EFTs in the Garnishee accounts and EFTs blocked midstream between independent banks does not affect the outcome here, because both are "funds transfers" under New York property law.

This is particularly so because, under Article 4-A, "[a] branch or separate office of a bank is a separate bank for purposes of this article." N.Y. U.C.C. § 4-A-105; *see also Motorola Credit Corp. v. Standard Chartered Bank*, 24 N.Y.3d 149, 160, 996 N.Y.S.2d 594, 21 N.E.3d 223 (N.Y.2014) (upholding separate entity rule as a "firmly established principle of New York law").

This provision of New York law undercuts Martinez's argument that the involvement of different branches of the Garnishee bank fundamentally changes the nature of the funds transfer. Under U.C.C. Section 4-A-105, an EFT blocked while clearing an intermediary Garnishee branch mid-transfer between two other Garnishee branches would be deemed a funds transfer between different banks for purposes of determining property interests under Article 4-A.

In light of N.Y. U.C.C. Section 4-A-105, *Calderon-Cardona* and *Hausler* bar attachment in this case, because "the entity that passed the EFT on to the bank where it presently rests," 770 F.3d at 1001, is a different branch of Garnishee bank for both Accounts One and Two. Further, even if the transfers described in Accounts One and Two were book transfers within the same bank, the legal right of ownership would be transferred to the beneficiary only upon acceptance of the payment order from the beneficiary bank, *see* N.Y. U.C.C. § 4-A-502 cmt. 4, an event that Martinez has not shown happened at any point before the transfers were blocked.

The Second Circuit decisions in *Calderon-Cardona* and *Hausler* apply to Martinez's turnover petition and dictate that New York law determines what constitutes property attachable under FSIA Section 1610(g) and TRIA Section 201. The Court is persuaded that under New York law, the blocked assets in the Garnishee accounts are property of Cuba attachable under TRIA Section 201 only if Martinez can show that the funds were transmitted directly to the New York branch of Garnishee from Cuba or a Cuban agency or instrumentality. Martinez has not shown any evidence compelling that conclusion.

#### c. *VERA IS DISTINGUISHABLE*

Martinez points to a recent district court decision, *Vera v. Republic of Cuba*, No. 12

Civ. 1596 (S.D.N.Y. Sept. 24, 2015), which she argues is sufficiently similar to Martinez's petition to compel a similar outcome even if *Calderon–Cardona* and *Hausler* apply. That decision, however, is distinguishable because it involved a transaction that undisputedly originated with a Cuban entity.

In *Vera,* the petitioner, holder of a civil judgment against Cuba, sought to attach funds blocked while passing through a U.S. bank mid-transfer between two foreign banks. The intermediary bank and the originating bank had disclaimed any interest in the blocked funds, and all information about the originator had been removed from the account. In *Vera,* the garnishee bank had stipulated as part of a prior Department of Justice investigation that it had stripped identifying information from transfers made between accounts of Cuban entities. *Vera,* No. 12 Civ. 1596, at 3–4 (S.D.N.Y. Sept. 24, 2015). Based largely on this stipulation, the *Vera* court found that since 1) no other party had asserted interest in the funds and 2) under the CACRs the funds could not be released to Cuba or a Cuban entity, the funds had to be turned over to the judgment debtors. *Id.* at 5.

The United States argues that *Vera* was wrongly decided because a bank cannot legally release funds intended for a Cuban agency or instrumentality under Section 515.201(b)(2) CACRs, which prohibits "[a]ll transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States." 31 C.F.R. § 515.310. The Court need not decide whether *Vera* was correctly decided, because it is clearly distinct from this case. Whereas the court in *Vera* found it undisputed that the blocked funds transfer originated with a Cuban bank attempting to move money between two of its accounts, *see Vera,* 12 Civ. 1596, at 5

(S.D.N.Y. Sept. 24, 2015), here the provenance of the funds in Accounts One and Two is very much in dispute.

Martinez suggests that because no originator information is listed for Accounts One and Two, the Court should presume that the funds originated from a Cuban entity and that originator information was purposefully scrubbed. (*See* Plaintiff's Response in Opposition, Dkt. No. 84, at 16 ("Like the Court in *Vera,* this Court should make the same inference here where records indicate that an agency or instrumentality of the Republic of Cuba, whose information was stripped from the wire information, was moving money …").) In *Vera,* though, the court relied on more than inference; the petitioner in that case had offered as evidence the Stipulation of Facts admitting the garnishee bank's role in scrubbing the originator information. No such admission exists here.

Although Martinez asserts in her briefing that "at no point in the course of the transactions involving [redacted] was Cuba's property interest in the EFTs broken," *id.,* she presents no evidence that [redacted] was the originator of the EFTs in either of Account One and Two. Martinez cites several news articles that discuss in general terms banks violating sanctions regimes. (Plaintiff's Response in Opposition, Dkt. No. 84, at 18.) She also provides two faxes referring to a "[redacted] blocked account", but with no identifying information or context linking them to Accounts One and Two. (Plaintiff's Response in Opposition to Supplemental Statement, Dkt. No. 99, Ex. D–1.) Martinez has provided no evidence that would lead the Court to conclude that the originator of Accounts One and Two was a Cuban entity, and the Court declines to infer so based solely on the lack of originator information. An equally plausible alternative is that a non-Cuban customer of

[redacted] sought to transmit a payment via Garnishee's New York branch, which was then blocked because the transaction listed [redacted] as the beneficiary. (*See* Statement of Interest, Dkt. No. 97, Ex. B.)

Petitioner has not shown that the blocked EFTs in Accounts One and Two were transmitted to the Garnishee bank directly by Cuba or one of its agents or instrumentalities, as required by Second Circuit law. Therefore, as with Accounts Three through Seven, the Court is persuaded that the proceeds of the blocked EFTs held in Accounts One and Two are not assets of Cuba or a Cuban entity attachable under TRIA Section 201. Martinez's Petition is therefore denied as to all accounts listed in the Account Summary.

### III.  *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion for turnover (Dkt. No. 75) of Petitioner Ana Margarita Martinez is **DENIED**.

**SO ORDERED.**